**UNITED STATES**

v.

Chad E. KELLY, 566–27–0726, Yeoman Seaman Apprentice (E–2), U.S. Navy.

NMCM 93 00141.

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 7 Oct. 1992.

Decided 13 June 1994.

LT Gerard Wm. Wittstadt, Jr., JAGC, USNR, Appellate Defense Counsel.

CDR Timothy C. Young, JAGC, USN, Appellate Defense Counsel.

Capt Laulie S. Powell, USMC, Appellate Government Counsel.

LCDR David B. Auclair, JAGC, USN, Appellate Government Counsel.

Col T.G. Hess, USMC, Appellate Government Counsel.

Before REED, Senior Judge, and LAWRENCE and DeCICCO, JJ.

PER CURIAM:

Consistent with his pleas, the appellant was found guilty of numerous offenses involving the theft and wrongful use of other service members' credit cards, including conspiracy to commit larceny, larceny, forgery, and stealing mail matter, in violation of Articles 81, 121, 123, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 881, 921, 923, 934. He was sentenced by the military judge to a dishonorable discharge, confinement for 2 years, forfeiture of all pay and allowances, and reduction to pay grade E–1. The convening authority approved the sentence; however, pursuant to a pretrial agreement, he mitigated the dishonorable discharge to a bad-conduct discharge. The case is now before us upon mandatory review pursuant to Article 66(c), UCMJ, 10 U.S.C. § 866(c).

The appellant has raised seven assignments of error for our consideration.[1] Assignments of error III–VII have been decid-

1. I. THE MILITARY JUDGE ERRED WHEN HE FOUND APPELLANT GUILTY OF CHARGE V, SPECIFICATIONS 14 AND 15.

II. THE FORUM AND APPROVED SENTENCE IN APPELLANT'S CASE IS INAPPROPRIATELY SEVERE IN RELATION TO THE FORUM AND PUNISHMENT IN THE CASE OF APPELLANT'S CO-CONSPIRATOR, YN3 H. LAWRENCE GARRETT, IV, USN, THE SON OF THE THEN–SECRETARY OF THE NAVY.

III. THE COURT–MARTIAL DID NOT HAVE JURISDICTION BECAUSE THE MILITARY JUDGE WAS NOT APPOINTED TO A FIXED TERM OF OFFICE. (CITATION OMITTED.)

IV. THIS COURT HAS NO JURISDICTION BECAUSE ITS JUDGES ARE NOT APPOINTED TO FIXED TERMS OF OFFICE. (CITATION OMITTED.)

V. APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIGNATED IN VIOLATION OF THE APPOINTMENTS CLAUSE OF THE UNITED STATES CONSTITUTION. (CITATION OMITTED.)

VI. BECAUSE THIS COURT'S JUDGES WERE APPOINTED IN VIOLATION OF THE APPOINTMENTS CLAUSE, THIS COURT HAS

ed adversely to the appellant and will not be discussed further. *Weiss v. United States,* — U.S. ——, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994); *United States v. Mitchell,* 39 M.J. 131 (C.M.A.1994). The first assignment of error has been conceded by the Government, and we will take appropriate action in our decretal paragraph. The remainder of this opinion concerns the second assignment of error, which itself presents several issues.

The first issue presented is whether unlawful command influence was exercised in the appellant's case to his prejudice. The second issue is whether the appellant's case is closely related to that of Yeoman Seaman [YNSN] H. Lawrence Garrett, IV, U.S. Navy, the son of the then-Secretary of the Navy, whose offenses were disposed of at nonjudicial proceedings under Article 15, UCMJ, 10 U.S.C. § 815, and, if so, whether the disparate treatment between the two cases resulted from impermissible considerations and inappropriate actions rather than good and cogent reasons. We conclude that the record contains no evidence of unlawful command influence regarding the appellant's case. We further conclude that the appellant's and YNSN Garrett's cases are closely related and that the widely disparate treatment between the two cases resulted from favoritism towards YNSN Garrett due to his status as the son of the then-Secretary. Therefore, exercising our broad authority pursuant to Article 66(c) to affirm only findings and a sentence that we conclude should be affirmed, we will substantially reduce the appellant's sentence.

## I. BACKGROUND

At trial, the appellant did not raise an issue of unlawful command influence concerning his case. He pled guilty to the conspiracy specification by adding the name of Yeoman Third Class (Frocked) Garrett[2] as a co-conspirator. The appellant was found guilty in accordance with this guilty plea. During the sentencing portion of the trial, in an unsworn statement, the appellant said that YNSN Garrett and another person talked him into the theft of the credit cards, and that YNSN Garrett and the other individual were active participants in the use of the stolen cards. Record at 60–62. A defense exhibit was introduced that showed that YNSN Garrett's offenses had been disposed of at an Article 15, UCMJ, nonjudicial proceeding, referred to as "Captain's Mast" in the Navy.[3]

Appellate defense counsel submitted a Freedom of Information/Privacy Act request to the Bureau of Naval Personnel [BUPERS] requesting documents relating to YNSN Garrett's offenses and their disposition. The request was denied. Appellant then asked this Court for an order to compel the production of the requested documents pursuant to 5 U.S.C. § 552a(b)(11), and supported this request with a memorandum of law. We concluded that this request and its accompanying memorandum raised two allegations: (1) unlawful command influence occurred in the appellant's case, and (2) the forum and approved sentence in the appellant's case are widely disparate in relation to the forum and punishment in the case of YNSN Garrett under the principles set forth in *United States v. Olinger,* 12 M.J. 458 (C.M.A.1982) and *United States v. Driver,* 36 M.J. 1020 (N.M.C.M.R.1993). We ordered the Govern-

NO POWER TO REVIEW APPELLANT'S CASE. (CITATION OMITTED.)

VII. THE INVOLVEMENT OF THE ASSISTANT JUDGE ADVOCATE GENERAL FOR MILITARY JUSTICE AND THE JUDGE ADVOCATE GENERAL OF THE NAVY UN THE PREPARATION OF THIS COURT'S JUDGES' FITNESS REPORTS DEPRIVES THIS COURT OF ITS INDEPENDENCE AND THE APPEARANCE OF INDEPENDENCE. (CITATION OMITTED.)

**2.** During the investigation of the two cases, YNSN Garrett was frocked to Yeoman Third Class. For the sake of simplicity, we refer to him throughout this decision as a yeoman seaman, YNSN.

**3.** Nonjudicial punishment under Article 15, UCMJ, provides military commanders with a means to punish offenders for acts or omissions that are minor offenses of the UCMJ. The determination of whether an offense is "minor" is a matter of discretion for the commander imposing nonjudicial punishment, but it is defined as an offense that "ordinarily" does not include a dishonorable discharge or confinement for longer than 1 year if tried by general court-martial. Part V, Manual for Courts–Martial, United States, 1984.

ment to make available to appellate defense counsel certain listed information and documents, limiting the disclosure of this information and documents to the parties to protect the privacy rights and interests of the persons concerned.

In response, the Government provided to appellate defense counsel and this Court the Naval Investigative Service [NIS][4] investigation encompassing both cases. In addition, the Government submitted several typed declarations, executed under penalty of perjury, of officers involved in the two cases. These declarations are discussed below, referred to as the First Declarations. The Government also requested that certain sensitive personnel records of YNSN Garrett be inspected by the Court *in camera* to determine the necessity for their disclosure to the appellant. Based on these submissions, we requested that several specific questions be answered by the Government, and the Government promptly replied. Thereafter, the Government submitted copies of YNSN Garrett's transfer orders from the San Diego area to Washington, D.C.

Appellate defense counsel submitted no information or documents to the Court in response to the Government's submissions but did submit a brief requesting sentence relief based on the widely disparate treatment in the two cases for which the record allegedly provided no good and cogent reasons. The Government replied that there existed no evidence of unlawful command influence in appellant's case and that the two cases were not closely related. By order, we again asked that the Government answer several specific questions, and again the Government promptly replied. Thereafter, the Government submitted the declarations of the then-Executive Assistant to the Chief of Naval Personnel, who had a role in YNSN Garrett's transfer from San Diego, and that of then-

Vice Admiral [VADM] Jeremy Boorda, U.S. Navy, who was the Chief of Naval Personnel and Deputy Chief of Naval Operations for Manpower, Personnel, and Training when the transfer took place.[5] Appellate defense counsel then submitted a declaration from the appellant. When appellate defense counsel submitted no additional information or documents, this Court ordered oral argument. During oral argument, appellate defense counsel conceded that the record contained no evidence of unlawful command influence in the appellant's case. In response to questions by the Court, appellate defense counsel admitted that he had not interviewed or contacted any of the officers who provided the declarations that were submitted by the Government.[6] Faced with this concession, the Court inquired of both sides whether a hearing conducted pursuant to *United States v. DuBay*, 17 C.M.A. 147, 37 C.M.R. 411, 1967 WL 4276 (1967), should be ordered. The Government argued that no compelling reason for such a hearing existed; however, the defense requested one.

Following oral argument, appellate defense counsel formally requested a *DuBay* hearing by brief, and the Government countered that no basis had been shown for the hearing. Thereafter, the Government submitted additional information and declarations. A few declarations supplemented those of earlier declarants, but most were from additional declarants. They are summarized and discussed below, referred to as the Second Declarations.

In response, we issued an order advising that, based on the information and documents submitted, we would not affirm a sentence greater than time served in confinement as of the date of the order. We also directed in the same order that the Judge Advocate General communicate this conclusion to the Secretary of the Navy to permit

---

4. The Naval Investigative Service was subsequently redesignated and is currently known as the Naval Criminal Investigative Service.

5. Subsequent to his actions in this case, VADM Boorda was promoted to the rank of admiral and assigned as Commander-in-Chief, Naval Forces Europe and Commander-in-Chief of Allied Forces in Southern Europe. He currently serves as the Chief of Naval Operations. Because he

held the rank of vice admiral at the time of his actions in this case, we will refer to him in that grade in this decision.

6. Appellate defense counsel stated that he was inexperienced in appellate litigation and uncertain as to how to collect and submit factual matter to this Court.

him to consider exercising his Article 74, UCMJ, clemency authority to release the appellant from confinement. The Government then requested that the case be heard *en banc* and indicated that the appellant had just recently been released from confinement. The request for *en banc* reconsideration was denied. Based on the representation that the appellant was no longer in confinement, we withdrew our earlier order to the Judge Advocate General.

Finally, having concluded that the appellant had failed to submit evidence of unlawful command influence in his case, and given his concession, we denied the appellant's request for a *DuBay* hearing and stated that the case would be decided on the existing record to include the affidavits or similar submissions already before the Court. We stated that "the parties shall submit any additional affidavits or other evidence to this Court within 10 days of the date of this order." Neither side submitted any affidavits, additional declarations, or other information. In this posture, the case is now decided.

## II. EVIDENCE SUBMITTED

### a. NIS Investigation

The following information is taken from NIS investigative reports submitted as a result of our limited grant of discovery as set out above. We summarize only the relevant information from the extensive investigation.

During the late spring of 1991, Sailors at Naval Air Station, North Island, located near San Diego, California, failed to receive credit cards issued to them, yet they received credit card bills with charges on the cards. They reported this to the local NIS office, and it opened an investigation. All of the cards had been sent through the Shore Intermediate Maintenance Activity [SIMA] post office at North Island.

On 11 October 1991, a petty officer provided a statement to an NIS agent that the appellant had used credit cards in an especially generous fashion. He said that YNSN Garrett and the appellant were friends. He also said that a female Sailor [C.R.], who was a friend of his, said that she had heard that the appellant was taking other persons' cred-

it cards and using them. The same day, an NIS agent interviewed C.R., who was a roommate of YNSN Garrett and another person [A.M.]. She said that YNSN Garrett had told her that the appellant had occasionally stolen credit cards from the mail room in which the appellant worked, but she opined that Garrett was not involved. That same day, the appellant confessed to an NIS agent to having stolen credit cards from the SIMA mail room and to using them.

On 21 October 1991, the Bureau of Naval Personnel [BUPERS] issued permanent orders transferring YNSN Garrett to the Chief of Naval Personnel Support Division, Washington, D.C., a division of BUPERS. The orders stated that YNSN Garrett was to be transferred in November 1991 and was to report no later than 6 January 1992.

On 22 October 1991, an NIS interim report was submitted that did not mention YNSN Garrett as a lead or a suspect. On 15 November 1991, however, an NIS Investigative Summary Report was submitted, with distribution copies to Naval Investigative Command Headquarters and the NIS Regional Office for the 11th Naval District that did mention YNSN Garrett by name. That report contained a summary of the statements of YNSN Garrett's roommate, C.R., and the appellant's admissions regarding the stolen credit cards.

On 30 January 1992, the appellant stated under oath to an NIS agent that YNSN Garrett was involved in the theft of the cards. He said that on one occasion YNSN Garrett encouraged him to steal a card, so they went together to the SIMA mail room where the appellant stole one in YNSN Garrett's presence. The appellant said he gave the card to YNSN Garrett who made all the fraudulent purchases with that card. The appellant alleged a cover-up because YNSN Garrett was the son of the Secretary of the Navy. The appellant questioned why no one had interviewed YNSN Garrett, to which the agent replied that YNSN Garrett's involvement was unknown.

On 11 February 1992, another one of YNSN Garrett's roommates, A.M., was interviewed and denied any involvement in or

knowledge of the theft or use of the credit cards. The same date, another female roommate of YNSN Garrett said that in the summer months of 1991, she knew that the appellant used stolen credit cards; however, she did not implicate YNSN Garrett.

On 24 February 1992, YNSN Garrett was interviewed in Washington, D.C., by NIS agents. After receiving an appropriate rights advisement, he gave a sworn statement in which he denied any criminal involvement in the stolen credit cards. The next day he provided handwriting exemplars and submitted to a polygraph examination. After the polygraph examiner evaluated the charts, he opined that YNSN Garrett was not truthful in denying involvement in or knowledge of the thefts. YNSN Garrett then admitted that his earlier sworn statement was false and that he had received property obtained through use of the cards. The interview was terminated by YNSN Garrett after he received a telephone call from his mother.

On 26 February, YNSN Garrett was re-interviewed. This time he admitted driving the appellant to the appellant's office in the mail room knowing that the appellant was going to steal a credit card there. Afterwards, he accompanied the appellant to a restaurant where the appellant paid for meals for Garrett and others with the card that Garrett knew had just been stolen. On the way home from the restaurant, the appellant also used the card to pay for gasoline for both his and Garrett's cars. YNSN Garrett also admitted being present in a hotel room where food and beverages were ordered from room service. He assumed that the appellant had paid for the room and these other items with a stolen card. On one occasion, he and another roommate, [T.C.], went to a shopping mall. On the way, the two put gas in Garrett's car, and T.C. paid for the gasoline with a card that Garrett knew had been stolen by the appellant and given to T.C. to use. At the mall, Garrett selected a pair of shorts and gave them to T.C. for purchase with a credit card that Garrett knew was stolen. Later, T.C. gave him the shorts and a T-shirt that also had been purchased using the card. On another occasion, Garrett and

T.C. asked the appellant to purchase an expensive vacuum cleaner with a stolen card, but the appellant refused. Garrett denied ever asking the appellant to get a stolen card for him or possessing or using a stolen credit card. He admitted again that his sworn statement of 24 February was false. He stated again under oath that this statement was the complete truth and was as much as he knew about the entire affair.

The next day, 27 February, Garrett provided additional information. This time he said there "might" have been an occasion when T.C. gave him a stolen credit card that Garrett, himself, used to pay for gasoline. After the interrogation into the theft and use of the credit cards, he also admitted smoking marijuana on two occasions at hotels rented through the use of stolen credit cards. He explained how he drank substantial quantities of water and used physical exercise in an effort to preclude a positive result on a urinalysis test. Again, he was administered a polygraph examination; his denial of having stolen any credit cards was inconclusive. After the examination, he admitted that he "might" have used a stolen card on two occasions to purchase gasoline.

Subsequently, during an NIS interview on 16 March 1992, T.C. provided a sworn statement that he was present: (1) when Garrett picked out merchandise for purchase with stolen credit cards, (2) when stolen credit cards were used at the restaurant to pay for meals, and (3) when he and Garrett solicited the appellant to purchase the expensive vacuum cleaner. He said he was also in the hotels where on two occasions the rooms, food, and beverages were paid for using stolen credit cards and marijuana was used by the occupants, including Garrett. He said that, while he was Garrett's roommate, they frequently used marijuana.

On 17 March 1992, another roommate, A.M., provided a sworn statement to an NIS agent in which he admitted using marijuana with Garrett "almost nightly." He said he knew that Garrett went with T.C. to buy merchandise using stolen credit cards. He knew that on at least two occasions stolen cards were used to put gasoline in Garrett's car because Garrett talked openly about it.

He knew that Garrett had received two or three pairs of shorts purchased with stolen credit cards. He said that just prior to Garrett's punishment at captain's mast, Garrett telephoned him and said that a shirt he had traded to A.M. for a sweatshirt was purchased with a stolen credit card.

On 2 April 1992, Captain [CAPT] Carlson M. LeGrand, Judge Advocate General's Corps, U.S. Navy, the Director of Legal Counsel to the Bureau of Naval Personnel, was briefed on the status of the investigation and was provided documentation regarding it.

### b. First Declarations

On 19 November 1992, Rear Admiral Luther F. Schriefer, U.S. Navy, the convening authority in this case, executed a sworn affidavit. In it he states that he was not influenced in his decisions in appellant Kelly's case by the then-Secretary of the Navy or any other superior authority.

On 23 November 1993, Commander [CDR] Michael J. Landers, U.S. Navy, Commanding Officer, Staff Enlisted Personnel, BUPERS, executed a sworn affidavit. He conducted the Article 15, UCMJ, nonjudicial punishment proceeding in the case of YNSN Garrett. In determining a proper disposition of the case, he considered the NIS Report of Investigation, YNSN Garrett's statements, and other information. He also relied on the recommendation from CAPT LeGrand.[7] CDR Landers said that he awarded punishment pursuant to Article 15 because he believed such action to be appropriate. He also said he was not subjected to any external influence and "treated YNSN Garrett as [he] would have treated any other sailor under similar circumstances."

On 23 November 1993, CAPT LeGrand executed a sworn affidavit. The affidavit states that YNSN Garrett reported to BUPERS on 16 December 1991, having detached from his command in San Diego on 30 November 1991. CAPT LeGrand asserts that neither he nor, to his knowledge, anyone at the Bureau of Naval Personnel was aware of YNSN Garrett's suspected implication in the investigation into the theft of credit cards at the time of Garrett's transfer. He first heard about Garrett's involvement in late-February 1992, after which he followed the investigation closely, to include receiving an NIS Report of Investigation and briefings by involved agents. During the investigation, he kept the Chief of Naval Personnel, VADM R.J. Zlatoper, U.S. Navy, apprised of its status.[8] They agreed that VADM Zlatoper should not discuss the case with any subordinates at the Bureau, especially CDR Landers. Captain LeGrand discussed the case with CDR Peter Fagan, Judge Advocate General's Corps, U.S. Navy, the Special Assistant to the Secretary of the Navy for Legal and Legislative Affairs, and, in effect, Secretary Garrett's military legal advisor. Both recognized the sensitivity of the case and the need to ensure that no improper influence occurred.

Ultimately, after reviewing the NIS reports, Captain LeGrand recommended that the charges against YNSN Garrett be disposed of at an Article 15 proceeding. He based his recommendation on the following factors:

(1) the relatively low monetary value of the property and services Garrett obtained with the stolen credit cards;

(2) the drug offenses were for use instead of distribution;

(3) the extent of Garrett's prior cooperation with NIS; and

(4) Garrett's prior exemplary evaluations and his lack of any previous disciplinary actions.

CAPT LeGrand was aware that, due to the appellant's more extensive criminality and the monetary value of the property with which he was involved (over $10,000), his

---

7. Then–Captain LeGrand has since been promoted to the rank of rear admiral. He now serves as the Deputy Judge Advocate General of the Navy and the Commander, Naval Legal Service Command. Because he held the rank of captain at the time of his actions in this case, we will refer to him in that grade in this decision.

8. VADM Zlatoper replaced VADM Boorda as the Chief of Naval Personnel when VADM Boorda was promoted to admiral and transferred to Europe.

charges would probably be referred for trial by general court-martial. At this time, YNSN Garrett was considered to be a potential witness for the prosecution. CAPT Le-Grand further considered what would occur if Garrett's charges were referred to a special court-martial. This included the requirement to corroborate Garrett's admissions regarding marijuana use and the possible location and sequence of any prosecutions. He believed he knew the full extent of Garrett's involvement based in part on the results of the polygraph examination taken after his confession.

On 24 November 1993, CDR Fagan executed a sworn affidavit which is supplemented by answers to specific questions asked by this Court. In pertinent part, the affidavit states his opinion that he did nothing that could be construed to be unlawful command influence in the appellant's case. When he became aware of the investigation concerning YNSN Garrett in late February 1992, he informed Under Secretary of the Navy Howard and Secretary Garrett. They all agreed that the Secretary should have no involvement in the case.

On 4 February 1994, VADM Boorda executed a declaration in which he states that he was Chief of Naval Personnel and Deputy Chief of Naval Operations for Manpower, Personnel, and Training when YNSN Garrett's transfer from San Diego to Washington, D.C., was ordered. He states that "sometime during the summer of 1991, [he] phoned YNSN Garrett to see how he was doing." They discussed YNSN Garrett's work and future plans such as going to college. YNSN Garrett said that he would like a transfer because he was unhappy in San Diego. VADM Boorda states that he believes that he discussed the matter with his Executive Assistant, Captain Lugo. At the time of this conversation, VADM Boorda indicates he was unaware of any criminal involvement by Garrett and did not learn of his alleged misconduct until later. He concludes the declaration as follows: "I did not receive any request or direction from Secretary Garrett to transfer his son to Washington."

### c. Second Declarations

On 23 March 1994, NIS Special Agent [SA] Kathleen Bray, who was the case agent in San Diego investigating appellant's crimes, executed a sworn affidavit. In it, she states that on 11 October 1991, when C.R. said that Garrett told C.R. that appellant had stolen a credit card from his command's mail room, the focus of the investigation was identifying victims and obtaining evidence. It was after the appellant implicated Garrett on 30 January 1992 that Garrett became a suspect. She asserts no one interfered with her actions in the case and she felt no pressure to treat Garrett any differently than any other suspect.

Also on 23 March 1994, NIS SA T.A. Miller executed a witnessed, unsworn statement. He states that, prior to YNSN Garrett's first polygraph examination, CDR Fagan called NIS and "indicated that he needed the telephone number of where the polygraph was taking place so that he could provide it to Garrett's mother who wanted to talk to her son." SA Miller told CDR Fagan to call back. SA Miller believes that he then spoke with NIS Deputy Commander Charles Lannom who told him to give CDR Fagan the telephone number. SA Miller subsequently called NIS Deputy Regional Director Victor McPherson to tell him to put any call from Mrs. Garrett through to her son. YNSN Garrett was then called by his mother while being interviewed regarding the polygraph examination, and Garrett thereafter terminated the interview. SA Miller opined that the investigating agents were upset that YNSN Garrett was allowed to talk with his mother during the course of the interrogation.

On 24 March 1994, the special agent in charge of the San Diego office of NIS provided a sworn statement. He could not remember when the case agent mentioned YNSN Garrett's name during the investigation. He also said he received no special guidance or pressure in investigating the case.

On 24 March 1994, NIS SA Kimberly Phillips–Rizzo executed a sworn statement. In it, she relates the events following YNSN Garrett's polygraph examinations on 25 February 1992. Following the tests, Deputy Re-

gional Director McPherson called to say that YNSN Garrett's mother would be calling and that the agents "were directed to interrupt the interrogation and allow [YNSN] Garrett to talk to her." Shortly thereafter, Mrs. Garrett called, YNSN Garrett spoke with her, and he subsequently terminated the interview.

SA Phillips–Rizzo also relates events on the next day when YNSN Garrett returned. Garrett opened the session by saying that the previous evening he had spoken with "a high ranking Navy lawyer who 'knew NIS very well' and was advised that 'NIS agents were professionals and would act like his friend and they would play upon his manhood.'" YNSN Garrett refused to identify the lawyer but told the agents they "would know who he was." He then made incriminating admissions. On the same day or the day thereafter, YNSN Garrett said that he had asked his father to use his influence to obtain YNSN Garrett's transfer from San Diego to Washington, D.C. YNSN Garrett said he did not like the San Diego area because "military personnel were treated like second-class citizens" and "he could not get a date." He said that his father "told him to deal with it for approximately one year before he intervened and arranged for him to be transferred." Thereafter, he admitted marijuana use and provided a pair of shorts and a T-shirt that he had received from the use of a stolen credit card.

The same day, 24 March 1994, SA Phillip–Rizzo's co-agent, NIS SA Robert Iorio, executed a sworn statement. He states that on 25 February 1992, after a polygraph examiner indicated YNSN Garrett was deceptive, SA Iorio received a telephone call from Deputy Regional Director McPherson who said that Garrett's "mother would be calling." McPherson said that they were to interrupt the interrogation to allow Garrett to speak to his mother. Garrett terminated the interrogation "within minutes" after receiving his mother's call.

SA Iorio also related that the next day, Garrett returned for reinterrogation. Garrett told him he had spoken with "a high ranking Navy lawyer" who Garrett said worked with the NIS on a regular basis and

knew NIS "very well." Garrett said that this officer said NIS agents were "professionals" who would "play on [his] manhood" to coax him into making incriminating statements. Garrett refused to identify this officer, but he said that the agents would know who he was. Garrett then made incriminating statements. The next day, Garrett returned again to expand on his admitted culpability. This statement included admissions of repeated use of marijuana as well as other incriminating statements. He also said that he had been depressed in San Diego due to his inability to find a date. He said he had called his father frequently requesting a transfer from San Diego and that his father "finally intervened on his behalf and 'pulled some strings' to obtain a transfer for him to BUPERS that would allow him to live at home with his parents."

On 24 March 1994, NIS SA Blaine Thomas sent an unsworn electronic mail statement to NIS headquarters. In it, he recounts a meeting after the interrogation of Garrett in which Rear Admiral [RADM] Duvall M. Williams, Judge Advocate General's Corps, U.S. Navy, then the Commander of the Naval Investigative Service Command, apologized "for his interference in [the] investigation into former SECNAV's son." RADM Williams said he was "sorry for copious phone calls from either himself ... and/or Miller during Garrett's investigation." RADM Williams "also stated it appeared he was interfering; however, he was only concerned because of his friendship with the then SECNAV." SA Thomas recalled one phone call in which he and others had to allow YNSN Garrett to talk to his mother. This agent recounts that at the meeting NIS SA Frank Kauffman openly expressed his disgust with interruptions during an official investigation and asserted "that the ADM was on the borderline of obstructing justice." He stated that SA Kauffman told RADM Williams that he (Kauffman) would not be a party to such conduct and that he and SA Kauffman wondered whether they would have a job when it was all over. He said that SA Kauffman spoke the truth because RADM Williams' response to Kauffman's statement was "nothing more than a stare."

In a similar electronic mail message the same date, SA Kauffman generally supported this account. SA Kauffman stated:

Following the interrogations, searches, etc. re Garrett's son, ADM Williams called a meeting to explain or attempt to explain why he thought it necessary to allow the interruption of the polygraph of Garrett's son by a phone call from Garrett's mother. Though I'm not able to quote verbatem [sic] what he said, I specifically asked him if he was responsible for allowing that phone call to get through to the son. He said it was his decision and, right or wrong, he felt he owed it to the SECNAV because he was a close friend. He acknowledged that his decision might not be viewed as a popular one but it was his nonetheless.

Also on 24 March 1994, NIS SA Michael Vogel executed a sworn statement. SA Vogel administered a polygraph examination to YNSN Garrett. During one session, YNSN Garrett showed deception during a test. Prior to a subsequent interrogation, NIS SA Ray Reese received a telephone call from the Deputy Regional Director for the NIS Capital Region [SA McPherson] who said the agents should expect a call from either YNSN Garrett's mother or the lawyer for the Secretary. SA Reese was directed to interrupt the interrogation to allow YNSN Garrett to take the call. He states that YNSN Garrett terminated the interrogation following a polygraph examination which resulted in deceptive results when another Special Agent indicated YNSN Garrett had a telephone call which he should answer. The agents were extremely displeased with this order. Later, SA Vogel attended a meeting with RADM Williams during which agents noted that it was not normal procedure to interrupt an interrogation with a telephone call.

Also on 24 March 1994, SA Reese executed a sworn statement. He was present at the polygraph examinations and the subsequent interrogation that led to YNSN Garrett's termination of the interview after receiving a call from his mother. He states that he interrupted the interrogation because he had been ordered to do so by the Deputy Assistant Director of the NIS National Capital Region, SA McPherson, who earlier indicated that Mrs. Garrett or the Secretary's lawyer, CDR Fagan, might call and that he was to interrupt the interrogation and allow Garrett to talk to her in this case. SA Reese expressed his displeasure with this direction, and McPherson empathized, indicating that he had received this direction from Miller.

Also on 24 March 1994, SA McPherson executed a sworn statement. When YNSN Garrett was interrogated, SA McPherson was Deputy Regional Director of the NIS Regional Office of the National Capital Region. He received a telephone call from SA Miller who was acting Deputy Commander of NIS headquarters at the time. SA Miller specifically reminded SA McPherson that he (SA Miller) was acting Deputy Commander. SA Miller said that he was about to give SA McPherson "an order he suspected [SA McPherson] might not be in complete agreement with but, that he wanted carried out as stated." SA Miller asked for the telephone number for the NIS office where Garrett was to be interrogated. SA McPherson provided the number. SA McPherson states that "SA Miller then informed me either YNSN Garrett's mother or the Secretary of the Navy's lawyer, CDR Peter Fagan, USN, would call the NIS office to speak to YNSN Garrett and [SA McPherson] was to ensure that NIS Agents placed the call through to him promptly." SA Miller said that the order came from either COMNISCOM, then RADM Williams, or SA Lannom, then Deputy Commander, NISCOM, and SA Miller was "to make certain either CDR Fagan or Mrs. Garrett were allowed to speak to [YNSN] Garrett." SA McPherson also indicates that the agent who received this order openly disagreed with it.

On 29 March 1994, RADM Williams executed a declaration under penalty of perjury. In it, he states that he has known the Secretary since 1978 and considered him a close personal friend. He learned of YNSN Garrett's criminal involvement when Garrett was in Washington, D.C. He did not brief higher authorities because of the sensitive nature of Garrett's case and to prevent any hint of illegal command influence. About 24 Febru-

ary 1992, he informed the Secretary that his son was in custody and was being interrogated. After this, on the same date, he informed the Vice Chief of Naval Operations and the Under Secretary of the Navy, both of whom appeared to have no prior knowledge of the case. The following day, the Secretary asked for an update. RADM Williams told the Secretary that he had passed on all that the Secretary needed to know. That same day, NIS headquarters received a call from CDR Fagan requesting the telephone number where Garrett was being interrogated. RADM Williams states that authorities at NIS, including himself, agreed that the number should be revealed.

RADM Williams disputes whether he directed that Mrs. Garrett's call go through immediately. In the meeting after Garrett's interrogation was completed, RADM Williams said that he "did not give the order to let the phone call go through." He also says that, after reviewing the electronic mail messages from Special Agents Kauffman and Thomas, their allegations that RADM Williams made the decision to let the phone call from Garrett's mother to go through during the interrogation are untrue. He further states that SA Thomas' perception is also inaccurate.

On 30 March 1994, CDR Fagan provided a second declaration under penalty of perjury. In it, he states that he did not know why YNSN Garrett received his transfer from San Diego and learned of the transfer only after Garrett arrived in Washington, D.C. CDR Fagan learned of Garrett's alleged misconduct the day that NIS agents searched the Secretary's house.[9] On a day when Garrett was being interrogated by NIS agents, the Secretary's wife called him and said she was concerned for her son's well-being. CDR Fagan suggested that she call her son. CDR Fagan called the NIS office to obtain the number which he passed to Mrs. Garrett. He says he did not request that NIS agents put through the call.

CDR Fagan also states that one evening the Secretary called him at home and expressed concern that his son had not been fully advised of his rights. CDR Fagan said that he could advise him, although he could not represent his son or discuss the allegations of misconduct with him. The Secretary then put his son on the phone. CDR Fagan then conducted a "one-way conversation" with YNSN Garrett in which he advised him of his right to remain silent and to request counsel. He also said that NIS agents were trained to get him to talk. CDR Fagan does not remember telling YNSN Garrett that the NIS agents would play on his manhood.

On 31 March 1994, SA Kathleen Bray executed a second sworn affidavit. In it, she states that on 11 October 1991, when C.R. mentioned the name of H. Lawrence Garrett, IV, she knew he was the Secretary's son. She also confirms that the Investigative Summary Report of 15 November 1991, which mentioned YNSN Garrett's name, was distributed to NIS headquarters. She states that she did not interview Garrett because higher priority work, such as obtaining physical evidence, had to be done. She concludes by stating that had the appellant's case been prepared for trial, she would have interviewed YNSN Garrett but for the appellant's implication of Garrett in January 1992.

Also on 31 March 1994, H. Lawrence Garrett, III, the former Secretary of the Navy, executed a declaration under penalty of perjury. In it, he recounts the background of his son's decision to join the Navy and his (the Secretary's) solely professional relationship with VADM Boorda. He states that before his son enlisted in the Navy, VADM Boorda spoke to YNSN Garrett about the decision. In a four-page statement, the Secretary indicates that his son was harassed while he was on active duty because he was the son of the Secretary. In the summer of 1991, young Garrett expressed his displeasure with San Diego, in part because he wanted to attend college. The Secretary advised him to go to school at night. The Secretary recommended that he request sea duty but refused to intervene in his son's behalf. Sometime thereafter, VADM Boorda

---

9. YNSN Garrett was living at home with his parents and consented to a search of his room on

24 February 1992.

asked the Secretary how his son was doing, to which the Secretary replied that his son was unhappy and that the Secretary had advised him to request sea duty. In the fall of 1991, Garrett phoned his father to say that he had orders to Washington, D.C. The Secretary denies pulling strings to get the transfer. He further says that his son denied ever having made an allegation to NIS that the Secretary pulled strings to get the transfer.

The Secretary mentions his long personal relationship with RADM Williams. Before the search of portions of his house by NIS, he spoke to RADM Williams about his son being taken into custody. After the search, his son denied major involvement in the credit card thefts, however, the Secretary informed his son of the extent of his son's potential criminal liability as a thief in the eyes of the law.

Prior to his son taking a polygraph examination, the Secretary advised his son of his rights and told him that he should exercise his right to have a lawyer assist him. The Secretary also states that he clearly indicated to his son and his wife that he would do nothing to affect the situation. The Secretary does not remember a telephone conversation between himself, his son, and CDR Fagan, although he does not dispute that it may have occurred.

On 25 February 1992, the Secretary says he called RADM Williams to find out information about his son, but RADM Williams declined further comment. The Secretary thinks that his wife called CDR Fagan to get the number of the NIS office where his son's polygraph exam was being conducted. She later admitted calling that office. The Secretary then advised the Secretary of Defense of the developments. He asserts that he did nothing to influence the disposition of his son's case. After the investigation was completed and CDR Fagan told him of the offenses of which his son was suspected, he did ask CDR Fagan about the forum the offenses might warrant.

### d. Other Evidence

The record shows that YNSN Garrett's offenses were disposed of at an Article 15, UCMJ, nonjudicial proceeding on 28 April 1992, about 5 months prior to the appellant's trial. The charges upon which he was punished include one specification of use of marijuana on two occasions, one specification of larceny of food and gasoline, one specification of receipt of stolen property, including beverages, gasoline, a pair of men's shorts, and a T-shirt, and one specification of soliciting another to steal a vacuum cleaner. His punishment included restriction and extra duties for 30 days, forfeiture of $880 pay, and reduction to pay grade E–2. Defense Ex. D. Although pertinent regulations permitted appropriate authorities to initiate procedures for administrative separation from the Navy based on the offenses for which he was punished under this Article 15 proceeding, YNSN Garrett was not processed for administrative discharge.

## III. ANALYSIS

### a. Command Influence

■ Command influence is the mortal enemy of public confidence in the military justice system. Military courts are charged with a special responsibility to ensure that unlawful command influence is detected and, where it is found to exist, that appropriate remedies are taken to ensure that it has no effect on the disposition or trial of a case. This responsibility is so great that military appellate courts will inquire into allegations of unlawful command influence even if they are not raised at trial. *United States v. Johnston,* 39 M.J. 242, (C.M.A. 31 May 1994).

■ When an issue of unlawful command influence is reasonably raised during review of a case, affidavits generally provide an unsatisfactory basis from which to decide the issue. *United States v. Dykes,* 38 M.J. 270 (C.M.A.1993). If the issue is reasonably raised, a hearing conducted under *DuBay* should be ordered to fully develop all relevant facts.

■ We find that the evidence contained in the record of trial does not reasonably raise an issue of command influence in the appellant Kelly's case. No evidence has been presented that the convening authority or anyone else involved in the investigation

or disposition of the appellant's case was subjected to any unlawful influence. Appellate defense counsel conceded this finding during oral argument. Accordingly, a *Du-Bay* hearing is neither necessary nor appropriate.

### b. Case Disposition and Punishment Comparison Under Article 66, UCMJ

■ In *Olinger,* the Court of Military Appeals acknowledged the extraordinary scope of sentence review that Congress vested in the Courts of Military Review to establish uniformity of sentences. 12 M.J. at 460. The Court held that while the appropriateness of an accused's sentence is to be determined without reference or comparison to sentences in other cases, the Courts of Military Review may afford relief when there are highly disparate sentences in closely related cases. *Id.* In *United States v. Snelling,* 14 M.J. 267 (C.M.A.1982), the Court made it clear that a Court of Military Review may appropriately compare the dispositions in two cases even though one was tried at court-martial and the other was disposed of at an Article 15, UCMJ, nonjudicial proceeding. *Olinger* and its progeny establish that if two cases are closely related and yet result in widely disparate dispositions or sentences that are unsupported by good and cogent reasons, a Court of Military Review has the discretion to exercise its Article 66, UCMJ, authority to reduce the disparity upon review to erase any unfairness or injustice in the proceedings. *See also United States v. Claxton,* 32 M.J. 159, 162 (C.M.A.1991) (discussing the clear *carte blanche* held by the Courts of Military Review to do justice). We believe this authority is necessary to ensure both fairness and integrity in fact, as well as the appearance of fairness and integrity, without which the public, members of Congress, and service personnel will lose confidence in the military justice system.

■ This broad authority must be exercised in a principled manner. Post-trial remedies may not result from whim or caprice, mere suspicion or innuendo of undefined wrongdoing, or unstated reasons that provide no explanation or guidance to commanders or judge advocates. In properly exercising this authority, a military reviewing court must set out the legal principles that guide it and explain how the application of the facts to those principles justifies the court's decision.

■ When a disparity results from an unlawful or inappropriate consideration of a factor such as race or religion, we will provide an adequate remedy. When such a clearly suspect factor is absent, our discretion must necessarily come into play. We conclude, first, that as a threshold requirement for the review of forum selection or sentence comparison, the cases must involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design. Those that are, we label as "closely related." Next, the reviewing court must decide whether the disparity in disposition or sentence results from good and cogent reasons. When a wide disparity exists for reasons that are neither good nor cogent, the reviewing court has discretion to remedy the disparity.

■ The decision whether to remedy a disparity turns on the reasons for it. Discretion that is exercised in the area of the selection of the appropriate forum for disposition of charges is a part of prosecutorial discretion. Convening authorities are accorded broad discretion in deciding whether a case should be dismissed, handled administratively (such as through an Article 15, UCMJ, proceeding), or by court-martial. *See* Rule for Courts–Martial 306. Decisions on how to process a case are not considered *de novo* at the reviewing court level. Ordinarily, leniency towards one accused does not necessarily flow to another, nor should it. Disparity that results from a convening authority's inexperience or even bad judgment does not necessarily entitle a service person to some form of appellate relief.

■ We do conclude, however, that our discretion clearly should be exercised in cases in which the disparity in disposition or sentence results from a factor that seriously detracts from the appearance of fairness and integrity in military justice proceedings. From the evidence summarized above, we find that senior judge advocates and YNSN

Garrett's immediate commanding officer acted to protect YNSN Garrett from a more serious, yet just and appropriate disposition and sentence due to his status as the son of the Secretary of the Navy. Therefore, this case meets the aforementioned standard for granting relief upon review.

We conclude, first, that the appellant's and YNSN Garrett's cases are closely related. The appellant's crimes involved the theft of mail matter and use of stolen credit cards to steal goods and services. YNSN Garrett admitted driving the appellant to the SIMA mail room where the appellant was to steal or retrieve a stolen credit card that came from the mail. YNSN Garrett later was a principal to several thefts through use of the stolen credit cards. Undoubtedly, under the law of principals, YNSN Garrett was the actual thief of at least one of the cards and was active in their subsequent unlawful use. These acts were generally similar in nature and seriousness to the appellant's offenses.

In addition, the two cases arose from a common scheme. Even assuming that the appellant began stealing the cards on his own initiative in order to steal goods and services, YNSN Garrett and others certainly joined the scheme at some point. As noted previously, YNSN Garrett apparently aided the theft of one card, and he frequently benefitted from the theft and use of the cards. He ultimately became sufficiently involved in the criminal enterprise for us to find that his and the appellant's offenses arose from a common scheme in which both took part.

There is no reasonable question that the disposition and sentence in the two cases are widely disparate. The appellant received a federal criminal conviction, a punitive discharge, substantial confinement, and the loss of over $14,000 in pay. YNSN Garrett received an administrative punishment not considered a conviction, no punitive discharge, no confinement (only extra duties and re-

striction to a base for 30 days), and the loss of $880 in pay.

A central issue is whether this disparity in disposition and sentence is for good and cogent reasons. We conclude that such reasons are wholly absent in the record before us.

The Government emphasizes the number and seriousness of the appellant's offenses and stresses that his punishment is appropriate. We agree entirely. The Government's suggestion, however, that YNSN Garrett's offenses were minor and of a nature and seriousness that warranted disposition by an Article 15, UCMJ, proceeding is without any basis in experience or reason.[10] The evidence before us indicates that YNSN Garrett was a principal to the theft of at least one credit card from the mails. He stole gasoline and clothing on several occasions, received stolen food and beverages on several occasions, and solicited the theft of an expensive vacuum cleaner. These offenses alone warrant trial by a special court-martial with authority to adjudge a punitive discharge and confinement of up to 6 months. Yet these offenses do not stand alone. He also confessed to multiple uses of marijuana, and the evidence indicates regular and steady use. Lastly, he lied under oath more than once to NIS agents, crimes that are also punishable under the UCMJ.[11] Had YNSN Garrett been tried by a general court-martial for these crimes, the maximum sentence he could have received would have included a dishonorable discharge and confinement for 23 years. We conclude that nothing in this record justifies the disparity in disposition and sentence between these two cases.

The most difficult issue is whether the unreasonable disparity between the cases results from an unfortunate but relatively benign factor, such as poor judgment or inexperience in military justice matters on the part of the officers who directed the disposition of YNSN Garrett's case, or worse, from

---

10. Such an argument is totally inconsistent with the position the Government takes in other cases which involve a single drug offense or a single theft where it argues that such offenses are serious and warrant punitive separation.

11. It appears that all of the charges against YNSN Garrett were derived from his own admissions rather than from a complete and thorough investigation. Thus we are unsure of his full complicity in the criminal activity that took place in San Diego.

an impermissible factor. Unfortunately, we conclude that just such an impermissible factor infects the processing of YNSN Garrett's case.

We turn first to YNSN Garrett's transfer from San Diego to Washington, D.C. At the time of this transfer, he was a single Sailor who had been assigned to shore duty on a major staff in California immediately after receiving his initial military training—certainly a desirable assignment for most naval personnel in similar circumstances. After reports of the loss of credit cards at SIMA and the opening of an NIS investigation, YNSN Garrett contacted his father to complain that his petty officers were harassing him, he wanted to attend college, and his romantic interests were unsatisfied. Complaints by young Sailors in the Navy concerning their superior petty officers are hardly uncommon. As the Secretary's own statement makes clear, higher educational opportunities were available in San Diego. YNSN Garrett's romantic prospects were a frivolous concern. From all of the circumstances, there is a reasonable inference that YNSN Garrett's true motive for wanting to leave San Diego was other than the reasons he related to his father. He certainly did not want to be caught by the growing investigation into the theft and wrongful use of the credit cards, and he probably thought that duty in Washington would provide him a safe haven. Therefore, he sought his father's assistance.

The Secretary informed VADM Boorda that YNSN Garrett was not happy in San Diego. While we do not doubt the statements that the Secretary did not solicit VADM Boorda's phone call, we conclude, nevertheless, that VADM Boorda called YNSN Garrett in response to the Secretary's comment some time during the summer of 1991. VADM Boorda then told his Executive Assistant that the Secretary's son was unhappy in San Diego and to discuss the matter with YNSN Garrett. We believe that YNSN Garrett's transfer was the anticipated and predictable result of the Secretary mentioning this situation to the Chief of Naval Personnel, the senior officer in the Navy having cognizance over personnel transfers.

We conclude that YNSN Garrett's transfer resulted solely from his status as the son of the Secretary of the Navy. His shore assignment was terminated well before the normal rotation date for reasons that are uncompelling. The only conclusion left to us is that he was transferred cross-country because the Secretary mentioned his son's unhappiness to VADM Boorda, and not because the needs of the Naval Service were furthered by the move. There is no evidence, however, that either VADM Boorda or any of the officers who effected the transfer were aware of YNSN Garrett's suspected criminal involvement at the time of the transfer.

When the appellant disclosed YNSN Garrett's offenses, YNSN Garrett had been removed from the place where most of his crimes had been committed. While NIS was certainly able to continue the investigation of YNSN Garrett in Washington, we are convinced that, once he left San Diego, the eventual disposition of the charges against him was affected because those who had the responsibility to handle his case in Washington were more likely to be influenced by his status than others in a different location. The investigation in Washington, D.C., is replete with actions by naval and NIS personnel that demonstrate that YNSN Garrett's case was not handled in the normal course of military justice.

First, YNSN Garrett conversed with the Secretary's military legal advisor, a member of the Judge Advocate General's Corps and an officer who represents the Naval Service rather than any particular officer or service member. This officer elected to obtain the telephone number of the NIS office where YNSN Garrett was being interrogated so that his mother could interrupt that interrogation. The evidence shows that the night before an NIS interrogation, that officer chose to provide a rights advisement to a military accused, to include advice regarding NIS interrogation techniques. Predictably, the following day, YNSN Garrett explained his close relationship with this lawyer to NIS special agents for whatever effect he thought that relationship might have on them.

Additionally, the Commander, Naval Investigative Service Command, intervened in

the investigation to further the perceived interests of the Secretary. We find that, contrary to his assertions, RADM Williams did direct that Mrs. Garrett's or CDR Fagan's telephone call be put through during YNSN Garrett's interrogation. We also find that his actions in the case of YNSN Garrett were motivated by loyalty to a close personal friend, a desire to spare the Secretary personal anguish and public embarrassment, and a desire to dispose of an awkward situation in the most expeditious manner possible instead of fulfilling his duty as the head of NIS to ensure that a complete and accurate investigation of YNSN Garrett's case was completed. This fact became obvious to the NIS agents who investigated YNSN Garrett's alleged offenses.

The NIS investigation ultimately went before CAPT LeGrand, the senior military lawyer in BUPERS. His explanation for recommending that YNSN Garrett's case be disposed of at an Article 15, UCMJ, nonjudicial proceeding is unconvincing. First, he spoke of the low monetary value of the property and services YNSN Garrett obtained. The evidence before us does not indicate what that overall value was because no investigator was called upon to tally the total, however, it certainly was at least several hundred dollars. He next considered that the drug offenses were for use as opposed to distribution. Convincing evidence of record suggests numerous if not frequent and prolonged use of marijuana by YNSN Garrett. We note that in our experience, cases of multiple drug use, standing alone, are commonly referred to trial by special court-martial where, upon conviction, the accused often receives a punitive discharge and months of confinement. We are perplexed by the reference to YNSN Garrett's cooperation with NIS as a reason for leniency in light of his evasion and showings of deception or inconclusiveness in his polygraph examinations results. In fact, by his own admission, YNSN Garrett lied under oath to NIS agents, an offense unmentioned by CAPT LeGrand in his declaration. Finally, while YNSN Garrett's prior clean record

was a legitimate factor to consider in the disposition of the charges against him, this factor pales substantially given the gravity of the offenses he faced. We also note that the appellant also had a good record prior to his general court-martial with no prior disciplinary actions.

CAPT LeGrand added that YNSN Garrett was a potential witness against the appellant. However, YNSN Garrett had lied under oath to NIS agents, and the appellant had already confessed. Consequently, both the usefulness and necessity for YNSN Garrett's testimony as a prosecution witness were in considerable doubt. Next, CAPT LeGrand referred to the requirement to corroborate YNSN Garrett's admissions. Considering the seized charge card receipts, the potential testimony of YNSN Garrett's roommates, and the other incriminating admissions in the case, this requirement was one that any prosecutor could easily meet. Finally, he referred to the situs of any prosecution, a problem arising solely from YNSN Garrett's early transfer, and one which was easily remedied by transferring him back to San Diego for disciplinary action. In short, the reasons for recommending disposition of YNSN Garrett's offenses at an Article 15, UCMJ, nonjudicial proceeding are unconvincing, and, in light of other evidence in this case, the only rational explanation for the extremely lenient treatment YNSN Garrett received was his status as the son of the Secretary.[12]

Anyone familiar with the NIS investigation in this case when YNSN Garrett's offenses were referred to an Article 15 nonjudicial proceeding in April 1992 must have been aware that when YNSN Garrett was transferred from San Diego, he had committed serious offenses and that the transfer took him away from the location of the witnesses and other evidence. Further, they must have known that YNSN Garrett was aware of his own misconduct when he pressed his father for a transfer. In the Navy, it is common practice to transfer an accused for

12. In his statement, RADM Williams acknowledges that he conversed with CAPT LeGrand regarding factual information in the case prior to nonjudicial punishment being imposed on YNSN

Garrett. RADM Williams did not further disclose the details of the conversation, and CAPT LeGrand did not mention this conversation in his affidavit.

disciplinary action from a current location back to a previous command where the alleged offenses occurred. When senior naval officers recognized the effect of YNSN Garrett's transfer from San Diego, the expected result would have been his transfer back to San Diego where his alleged offenses could have been fully pursued in the same course as though he had not obtained his transfer. The failure of responsible officers to follow this common practice is further evidence that YNSN Garrett received preferential treatment.

Finally, we note that YNSN Garrett was charged at the Article 15 proceeding with but one charge for two separate uses of marijuana. The evidence, however, indicated numerous uses. Only one larceny specification embraced his multiple larcenies. Only one specification of receipt of stolen property was drafted in spite of the evidence of several receipts. The charges did include one specification for soliciting the theft of an expensive vacuum cleaner, but no specification mentioned his false swearing to the NIS agents during his interrogation.

Although YNSN Garrett was punished for his offenses, he was not processed for administrative discharge following the Article 15 proceeding. Not only is it uncommon, but it is extraordinary that a Sailor could be found to have used marijuana repeatedly, to have stolen property using stolen credit cards taken from a Navy mail room, to have received stolen property stolen by using these cards, to have asked another Sailor to steal a vacuum cleaner by using another Sailor's stolen credit card, and to have lied to NIS agents under oath and then be retained on active duty without being processed for discharge. In this case, that result is not inexplicable. Based on our experience, we state with confidence that, absent extraordinary circumstances, any other Sailor in the U.S. Navy who faced such charges would have been tried by a court-martial.

In summary, we find that YNSN Garrett's transfer was based solely on his status as the son of the Secretary. The decision that his offenses should be disposed of at an Article 15 proceeding and that he would not be

processed for administrative discharge thereafter was based on the same status. We find that in YNSN Garrett's case the military justice process was infected throughout by senior naval officers who considered who the accused was rather than what he had done.

## IV. CONCLUSIONS

We find that neither Secretary of the Navy Garrett, Under Secretary of the Navy Howard, VADM Boorda, VADM Zlatoper, nor CDR Fagan exerted any unlawful or undue influence in the disposition of the appellant's case, nor was RADM Schriefer, the convening authority, subjected to any such influence.

We do find that RADM Williams, due to his close personal friendship with the Secretary, engaged in actions of favoritism toward YNSN Garrett to such an extent that NIS agents believed he might have been obstructing justice. He impeded the investigation of YNSN Garrett's involvement in the credit card scheme and later spoke with CAPT LeGrand, the legal advisor to the officer who would make the final decision concerning the disposition of the charges against YNSN Garrett.

We conclude that the appellant's and YNSN Garrett's cases are closely related and that their punishments are widely disparate. We further conclude not only that the disparity is not supported by good and cogent reasons, but also that it occurred as the result of an impermissible factor.

In deciding what action to take in light of our conclusions, we state the obvious: we are reviewing the appellant's conviction and sentence and not those of YNSN Garrett. We have no authority under the UCMJ to take any action regarding YNSN Garrett.[13] Therefore, we can attempt to balance the scales only by reducing the appellant's otherwise totally appropriate sentence. The Government has argued that the appellant's sentence should be affirmed in spite of what has taken place. We cannot accept such a result. More importantly, the integrity and fairness of the military justice system cannot accept

---

13. YNSN Garrett has been administratively dis-    charged from the Navy.

such a result. Preferential treatment of a suspect based on his family relationship to a high-ranking officer or civilian has no place in any reputable justice system. Therefore, we have decided to reduce the appellant's sentence substantially.

## V. DISPOSITION

Accordingly, as discussed in the beginning of this decision, the erroneous findings of guilty entered by the military judge as to specifications 14 and 15 of Charge V are set aside and those specifications are dismissed. The remaining findings of guilty are affirmed. Upon reassessment, and considering the disparate treatment and the reasons therefor, and considering the unique circumstances of this case, we affirm only so much of the sentence as includes confinement for 15 months, forfeiture of $420.00 pay per month for 15 months, and reduction to pay grade E–1.

LAWRENCE, Judge, concurs prior to retirement.