# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**J.A. FISCHER, D.C. KING, T.H. CAMPBELL**
Appellate Military Judges

## UNITED STATES OF AMERICA

v.

## JOSEPH M. HUTCHINSON
### SERGEANT (E-5), U.S. MARINE CORPS

### NMCCA 201500124
### GENERAL COURT-MARTIAL

**Sentence Adjudged:** 10 December 2014.
**Military Judge:** Maj N.A. Martz, USMC.
**Convening Authority:** Commanding General, Command Element, 11 Marine Expeditionary Force, Camp Lejeune, NC.
**Staff Judge Advocate's Recommendation:** Maj K.G. Phillips, USMC.
**For Appellant:** CAPT Jill James, JAGC, USN.
**For Appellee:** CDR Christopher J. Geis, JAGC, USN; Capt Matthew M. Harris, USMC.

**27 October 2015**

---
### OPINION OF THE COURT
---

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

PER CURIAM:

A military judge sitting as a general court-martial convicted the appellant, pursuant to his pleas, of attempts to sell military property, conspiracy to sell military property, wrongful sale of government property, wrongful use of a

controlled substance, and larceny[1] in violation of Articles 80, 81, 108, 112a, and 121 Uniform Code of Military Justice, 10 U.S.C. §§ 880, 881, 908, 912a, and 921. The military judge sentenced the appellant to confinement for two years, reduction to pay grade E-1, and a dishonorable discharge. The convening authority (CA) approved the sentence as adjudged.

The appellant argues his sentence is inappropriately severe and unjustifiably disparate with his co-conspirators' sentences, and asks this court to reduce his sentence so as to include no punitive discharge. We decline.

## Background

While deployed as the II Marine Expeditionary Force Headquarters Group Forward armory chief at Camp Leatherneck in Afghanistan during 2013, the appellant's armory compound was adjacent to the supply lot. His duties resulted in frequent interactions with supply warehouse Marines, including Corporal (Cpl) Raymond A. Vasquez. The two noncommissioned officers decided to sell unaccounted-for military equipment from the warehouse and split the profits. Outside the view of warehouse security cameras, on six to eight occasions, Cpl Vasquez delivered to the appellant supply system gear already scheduled for retrograde.

As part of their scheme, the appellant took away a variety of items—including flak jackets, deployment bags, SAPI plates, cold-weather "happy suits," and Gortex jackets—and coordinated illicit sales. On another occasion, Cpl Vasquez allowed the appellant to take armory gear (red-dot scopes) which had been delivered to the supply warehouse without signing for the items. The appellant also stole a thermal optic scope from a military property lot and various rifle parts from a retrograde lot. The appellant sold some of these items: a red-dot scope to Cpl Blake A. Eads; the thermal-optic scope to Cpl Jorge H. Sifuentes Jr.; and SAPI plates, plate carriers and day packs to Cpl Patrick R. Steinhaus.

At the armory, the appellant assembled rifle parts into M4/M4A1 upper receivers not included on his property accounts. He then individually approached, made agreements with, and received money from would-be buyers for seven upper receivers. The Naval Criminal Investigative Service thwarted his plan to

---

[1] The appellant was convicted of seven attempts, one conspiracy, three wrongful dispositions, one wrong use, and one larceny specification.

ship the upper receivers to the United States and complete sales to Cpl Eads, Sergeant (Sgt) Armando Ramirez, Cpl Sifuentes, Cpl Steinhaus, Cpl JR, Lance Corporal (LCpl) Frederick Howk III, and U.S. Army Sergeant HR.[2]  Beyond the upper receiver transaction, the appellant also received money from Sergeant HR for a flak jacket with SAPI plates, a thermal optic, a night vision monocular, and an Advanced Combat Optical Gunsight.  After redeploying, the appellate used Oxazepam without a prescription, testing positive in July 2014.

The CA's action indicates this is a companion case to seven special courts-martial which resulted in six convictions for various charges including violations of Article 80, 81, 108, 121, and 134 of the UCMJ.  The sentence in each of those cases included reduction to E-1, but other punishments differed.  Adjudged confinement varied from none in one case to nine months in two others.  The adjudged sentences included three bad-conduct discharges, three fines, and three monthly forfeitures.[3]

## Discussion

We review the appropriateness of sentences *de novo*.  *United States v. Lane*, 64 M.J. 1,2 (C.A.A.F. 2006).  When arguing for corrective action based on the exercise of our unique, highly discretionary authority to determine sentence appropriateness under Article 66, UCMJ, the appellant must demonstrate "that any cited cases are 'closely related' to his or her case and that the sentences are 'highly disparate.'  If appellant meets that burden . . . then the Government must show that there is a rational basis for the disparity."  *United States v. Lacy*, 50

---

[2] Cpl JR was acquitted by a court-martial.  The record is silent on what action was taken in the case of Sergeant HR.

[3] The CA's action reflects the six adjudged sentences:  Cpl Vasquez received six months' confinement, reduction to E-1, a $500.00 fine, and a bad-conduct discharge for three unspecified Article 108 offenses and two unspecified Article 121 offenses; Cpl Eads received four months' confinement, reduction to E-1, forfeiture of $750.00 pay per month for four months, and a $1,068.00 fine for an unspecified attempt; Cpl Sifuentes received nine months' confinement, reduction to E-1, and a $4,500.00 fine for an unspecified conspiracy and unspecified Article 134 offense; Cpl Steinhaus received nine months' confinement, reduction to E-1, a $1,500.00 fine, and a bad-conduct discharge for two unspecified attempts, an unspecified Article 108 offense and an unspecified Article 134 offense; LCpl Howk received three months' confinement, reduction to E-1, and forfeiture of $500.00 pay per month for three months for an unspecified attempt, two unspecified Article 121 offenses, and an unspecified Article 134 offense; Sgt Ramirez received reduction to E-1 and a bad-conduct discharge for two unspecified conspiracies and an unspecified attempt.

M.J. 286, 287 (C.A.A.F. 1999). "Closely related" cases are those involving "offenses that are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly,* 40 M.J. 558, 570 (N.M.C.M.R. 1994)*; see also Lacy*, 50 M.J. at 288 (citing examples of closely related cases as including co-actors in a common crime, service members involved in a common or parallel scheme, or "some other direct nexus between the servicemembers whose sentences are sought to be compared"). However, co-conspirators are not entitled to equal sentences. *United States v. Durant*, 55 M.J. 258, 260 (C.A.A.F. 2001). Just because an accused receives greater punishment than a co-accused does not mean his sentence is unjust. *United States v. Wacha*, 55 M.J. 266, 268 (C.A.A.F. 2001).

In assessing whether companion case sentences are highly disparate, we are "not limited to a narrow comparison of the relative numerical values of the sentences at issue," but may also consider "the disparity in relation to the potential maximum punishment." *Lacy*, 50 M.J. at 289. A vast difference in maximum punishments—as demonstrated by the appellant facing 122 years of confinement, total forfeitures and a dishonorable discharge instead of one year's confinement, forfeitures of two-thirds pay per month for 12 months, and a bad-conduct discharge like the others—can result from the CA's forum selections. A CA's discretion on "the selection of the appropriate forum for disposition of charges is part of prosecutorial discretion," and "[d]ecisions on how to process a case are not considered *de novo* at the reviewing court level." *Kelly*, 40 M.J. at 570. If cases are closely related yet result in widely disparate disposition, we must instead decide whether the disparity in disposition also results from good and cogent reasons. *Id.* at 571.

Citing cases beyond those in the CA's action, the appellant suggests our consideration, in accordance with *Wacha*, of other sale or transportation of functioning firearms cases will reveal a highly disparate sentence here: *Unites States v. Bredschneider*, 65 M.J. 739 (N.M.Ct.Crim.App. 2007)[4]; *Unites States v. Gargaro*, 45 M.J. 99 (C.A.A.F. 1996)[5]; and *Unites States*

---

[4] The sentence was 18 months' confinement, reduction to E-1, total forfeitures, and a bad-conduct discharge for stealing an M16 rifle from a military range, transporting it in interstate commerce, and possessing an unregistered firearm. *Bredschneider*, 65 M.J. at 740, 744-45.

[5] The sentence was dismissal, one year's confinement and total forfeitures for stealing enemy AK-47 rifles gathered from the battlefield after the Gulf War and illegally importing them. *Gargaro*, 45 M.J. at 100.

*v. McDaniel*, 1996 CCA Lexis 72, unpublished op. (A.F.Ct.Crim.App. 1996)[6]. Each of those cases has clearly distinguishable facts,[7] but they all involve disposition at general courts-martial and sentences at least partially exceeding the current special court-martial maximums under RULE FOR COURTS-MARTIAL 201(f)(2)(B), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).

Even if the companion cases are closely related and their sentences are highly disparate, we find the Government has demonstrated a rational basis for any sentence disparity and good and cogent reasons for different disposition forums. The record specifies the misconduct for which only some of the co-accused were convicted,[8] but facts developed at the appellant's trial reveal variations in culpability levels. The Marines who purchased or attempted to purchase items from the appellant were each, individually, less involved in the overall criminal enterprise than the appellant. He links those involved with the supply gear items and those who relied on his access to weapon parts and skills as an armorer to build and eventually import the stolen weapons components. He approached and initially solicited each of the Marines who bought supply gear and/or gave him money for rifle upper receivers. While Cpl Vasquez also sold a plate carrier and sleeping system directly to LCpl Howk, gave a plate carrier and Kevlar helmet to another Marine, and stole various supply items and a set of night vision googles[9], he was not involved in the upper receiver schemes. And, unlike the appellant's drug use the following year, nothing indicates any of the other cases had misconduct outside of the 2013 deployed context.

So on the whole, the appellant's conduct was more serious. He was senior to all but one of the other Marines. The

---

[6] The sentence was a bad-conduct discharge, fourteen months' confinement, and reduction to E-1 for shipping captured weapons and ammunition from Kuwait to the United States. *McDaniel*, 1996 CCA Lexis 72 at *1

[7] Bredschineider was not an armorer, not in a combat zone, and did not conspire with other servicemembers to steal or sell military property. Gargaro did not steal U.S. military equipment. McDaniel did not steal items from his own armory in an active combat zone.

[8] Prosecution Exhibit 3 is the *United States v. Vasquez* stipulation of fact, PE 4 contains the *United States v. Steinhaus* providence inquiry, PE 5 contains the *United States v. Sifuentes* providence inquiry, and PE 6 contains the *United States v. Eads* providence inquiry.

[9] PE 3.

Government provided sentencing evidence that he had been trusted in combat to manage an armory property account with a value in excess of $2.2 million, and that his armory chief billet description included the requirement to "maintain good order and discipline within the armory compound."[10]  The facts in this case are sufficiently different to explain and justify both the different forums and sentences, and those facts demonstrate the appropriateness of the appellant's sentence.

## Conclusion

The findings and the sentence as approved by the CA are affirmed.

For the Court

R.H. TROIDL
Clerk of Court

---

[10] PE 10 includes the appellant's fitness report covering 19 November 2012 through 31 March 2013.