*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
HUTCHISON, TANG, and LAWRENCE,
Appellate Military Judges

_____

**UNITED STATES**
Appellee

**v.**

**Joseph A. FELIX, JR.**
Gunnery Sergeant (E-7), U.S. Marine Corps
Appellant

**No. 201800071**

Decided: 19 June 2019.

Appeal from the United States Navy-Marine Corps Trial Judiciary. Military Judge: Lieutenant Colonel Forrest W. Hoover, USMC (arraignment); Major Michael D. Libretto, USMC (trial). Sentence adjudged on 10 November 2017 by a general court-martial convened at Marine Corps Base Camp Lejeune, North Carolina, consisting of officer and enlisted members. Sentence approved by the convening authority: reduction to E-1, forfeiture of all pay and allowances, confinement for 10 years, and a dishonorable discharge.

For Appellant: Mr. Samuel C. Moore, Esq.; Major Maryann N. McGuire, USMC.

For Appellee: Captain Luke Huisenga, USMC; Lieutenant Kimberly Rios, JAGC, USN.

Senior Judge HUTCHISON delivered the opinion of the Court, in which Senior Judge TANG and Judge LAWRENCE joined.

_____

**This opinion does not serve as binding precedent, but
may be cited as persuasive authority under
NMCCA Rule of Appellate Procedure 30.2.**

_____

HUTCHISON, Senior Judge:

A general court-martial consisting of officer and enlisted members convicted the appellant, contrary to his pleas, of eight specifications of violating a lawful general order, three specifications of maltreatment, and a single specification each of making a false official statement and drunk and disorderly conduct, in violation of Articles 92, 93, 107, and 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 893, 907, and 934 (2016).[1]

The appellant's convictions stem from his assignment as a drill instructor at Marine Corps Recruit Depot, Parris Island, South Carolina. On appeal, he raises five assignments of error:[2] (1) admission of prior acts and uncharged misconduct to show the appellant's alleged propensity to target Muslims and abuse recruits was prejudicial error; (2) the trial counsel committed prosecutorial misconduct by repeatedly referencing facts not in evidence during direct examination of the witnesses, argued facts not in evidence, and improperly inflamed the members' passions; (3) the appellant's counsel were ineffective for failing to properly voir dire the members, for failing to challenge the trial counsel's improper argument and use of facts not in evidence, and for failing to object to the trial counsel's repeated use of inadmissible evidence; (4) a victim's designee presented an unsworn statement during presentencing that lacked foundation and relevance and repeated the trial counsel's inflammatory theme; and (5) the members sentenced the appellant to an inappropriately severe and disparate sentence. We find no prejudicial error and affirm.

## I. BACKGROUND

The allegations at the center of the appellant's court-martial came to light following an investigation into the death of a Marine recruit during boot camp at Marine Corps Recruit Depot, Parris Island, South Carolina, in March 2016. The recruit, RS, was assigned to Platoon 3042 and the appellant

---

[1] The members acquitted the appellant of one specification of violating a general order, and of obstructing justice.

[2] We have reordered the assignments of error.

served as the platoon's Senior Drill Instructor. The investigation revealed numerous violations of the Recruit Training Order (RTO). The RTO is the governing document for all recruit training. It contains specific guidance on permissible and impermissible actions by drill instructors. Pertinent to the appellant's offenses, the RTO: prohibits waking the recruits after lights out; prohibits "incentive training" during the first week of boot camp;[3] limits incentive training to certain specified exercises and certain locations; prohibits making physical contact with recruits except in very limited circumstances; and prohibits maltreating recruits. As a result, the appellant was charged with, among other offenses, nine specifications of violating the RTO and three specifications of maltreating three different recruits, including RS. Several of the specifications alleging violations of the RTO contained multiple sub-parts, and altogether, identified over 15 named victims. The charges were not limited to the appellant's time with Platoon 3042, but spanned a period of twelve months and his role with three separate platoons. The specifications allege that the appellant punched, kicked, slapped, and strangled recruits; that he made recruits strangle other recruits; that he conducted unauthorized incentive training; and that he otherwise maltreated recruits in his charge.

The three maltreatment specifications claim the appellant singled out an individual recruit from each of the three platoons for harsher treatment; that the appellant called these recruits "terrorist" or "ISIS" and, among other things, ordered two of the three recruits to climb into an industrial-strength clothes-dryer.[4] Although not specifically alleged in the specifications, the trial counsel explained in his opening statement that the appellant singled out these three recruits because of their religion; that the appellant "targeted and abused three Muslim recruits from three separate platoons."[5]

While the appellant was charged with maltreating RS, he was not charged with causing his death. As a result, the military judge granted the appellant's motion and prohibited the government from suggesting that the appellant had any role in RS's death. The military judge did, however, take judicial notice of RS's death and, at the request of the appellant, instructed

---

[3] *See* Prosecution Exhibit (PE) 1 at 16. "Incentive training" is "an aid in instilling discipline and motivation, and is used to correct minor disciplinary infractions" and "consists of physical exercises administered in a controlled and deliberate manner as a consequence for minor disciplinary infractions." Marine Corps Recruit Depot/Eastern Recruiting Region Order [hereinafter Depot Order] 1513.6E, Chapter 1, ¶ 1008.

[4] Charge Sheet.

[5] Record at 461.

the members prior to opening statements that they could consider that RS was deceased for two limited purposes. First, to explain why RS would not be a witness despite being a named victim of one of the maltreatment specifications. And second, as background to the obstruction of justice specification because the government alleged that after RS's death, knowing that the Naval Criminal Investigative Service (NCIS) would investigate, the appellant ordered the rest of the platoon not to discuss RS's death "outside the squad bay."[6]

The government called 67 witnesses during its case-in-chief. These witnesses included fellow drill instructors and recruits from the three platoons with which the appellant interacted: Platoon 3042, Platoon 3052, where the appellant served as the Experienced Drill Instructor,[7] and Platoon 3054, which trained at the same time and shared a barracks with Platoon 3052. By the date of the trial, all of the recruits in the three platoons had either graduated boot camp and were stationed in Marine Corps units around the world, or they had separated from the Marine Corps. For purposes of simplicity, this opinion will refer to all of the victims as "Recruits" instead of their rank at time of trial.

**A. Platoon 3052 and 3054**

*1. RTO violations*

At trial, the government presented evidence of rampant misconduct by the appellant throughout the Platoon 3052 and 3054 training cycle. Sometimes the appellant's misconduct involved the entire platoon. Several recruits from Platoon 3052 testified that on one occasion the appellant forced them to drink excessive amounts of chocolate milk for lunch because of some infraction the platoon committed; after lunch, the appellant conducted incentive training on the platoon until several recruits vomited.[8]

Other times, the appellant focused on individual recruits. On one occasion the appellant came into the squad bay at night, smelling of alcohol, and con-

---

[6] Charge Sheet. The appellant was acquitted of this specification. *See* Record at 1757.

[7] The Experienced Drill Instructor or "Heavy" is "the backbone of the [drill instructor] team" responsible for teaching the recruits "how to eat, sleep, walk and get dressed in a timely manner." Record at 570-71. The "Heavy" was responsible for "every aspect of every day." *Id.* at 1123.

[8] *See* PE 1 at 12 (Depot Order, Ch. 1, ¶ 1005) (Prohibiting maltreatment and hazing).

fronted a recruit standing fire watch. He threw the recruit to the ground, "choked [him] out" with an "arm bar from behind" and then hit the recruit in the face twice with his closed fist, causing the recruit to bleed from the nose and mouth.[9] On another occasion, after scolding a recruit, AS, for an improper shave earlier in the day, the appellant directed another recruit to go to Recruit AS's bunk and "punch him a few times."[10] The recruit did as directed, but unsatisfied with the recruit's efforts at striking his fellow recruit, the appellant took matters into his own hands, pulled Recruit AS out of his bunk, telling him to "[g]et out of your rack, Bitch,"[11] and punched Recruit AS in the face, knocking him unconscious.

Another recruit from Platoon 3052 testified that the appellant put his hands around his neck twice as a "show of force."[12] The appellant slapped still another recruit with his open hand, after the recruit passed out from exhaustion during a hike. On another night during the last few weeks of recruit training, the appellant, smelling like alcohol, approached a Marine standing fire watch for Platoon 3054 and remarked that "ISIS was training while all our guys were sleeping," before slapping the Marine in the face.[13] The slap was hard enough that the Marine lost his balance.

The appellant's treatment of two specific recruits—one from Platoon 3052 and one from Platoon 3054—merits particular attention.

### 2. Maltreatment of Recruit RH

One evening during "Marine Week"[14] while the appellant was on duty, he and two fellow drill instructors left the barracks, went to the adjacent parking lot and drank whiskey, which the appellant provided. Later that night, the drill instructors returned to the Platoon 3052 squad bay and ordered the Marines standing fire watch to run around and conduct various physical activities, in violation of the RTO.[15] RH was one of the Marines standing fire

---

[9] Record at 1081.

[10] *Id.* at 1031.

[11] *Id.* at 993. The term "rack" is slang term for bunk or bed.

[12] *Id.* at 868-69.

[13] *Id.* at 676-77.

[14] Marine Week is a less-stressful period at the end of recruit training. *See id.* at 1124.

[15] *See* PE 1 at 19 (Depot Order, Ch. 3, Figure 3-6) (delineating appropriate incentive training and forbidding, among other things, administering incentive training "after evening showers to before reveille the next day").

watch when the drill instructors came into the squad bay. One of the other drill instructors, Sergeant ME, testified that the appellant was "screaming" at Recruit RH, "calling him ISIS and terrorist" and asking Recruit RH "questions about the Quran, about how Muslims are here to kill the Christians and stuff like that."[16] Earlier in boot camp, Recruit RH told the appellant he was Kurdish. He explained:

> It was one night I was in my rack. He approached me [because] I had made a mistake earlier in the day. He approached me and said not to make our people look bad. And I understood he might have thought I was of his ethnicity, and I explained to him I was Kurdish. And from that point on, he then knew I was Middle Eastern.[17]

Not satisfied with simply tormenting Recruit RH that night, the appellant eventually ordered the entire platoon out of their racks and directed them to perform various exercises: burpees, push-ups, and sprinting through the squad bay. The appellant and Sergeant ME then ordered the Marines into the laundry room. Several Marines testified that the laundry room was not big enough to accommodate the entire platoon, and as a result, the Marines ended up crammed into the small space. The recruits testified that they were piled on top of one another and kept running into and accidentally hurting one another due to their proximity. Despite the close quarters, the appellant ordered the entire platoon of recruits to do push-ups in the laundry room.[18] With the recruits crammed together on the deck, the appellant walked across the recruits, stepping on several.

While in the laundry room, the appellant continued to single out Recruit RH. The appellant ordered him to get into an industrial clothes dryer, saying "hey ISIS, get in."[19] Recruit RH did as directed and climbed into the dryer and sat inside for ten to fifteen seconds before the appellant ordered him to get out.

---

[16] Record at 1131.

[17] *Id.* at 767.

[18] *See supra* note 15. Chapter 3, Figure 3-6 of the Depot Order prohibits drill instructors from administering incentive training after evening shower and before reveille the next morning, and also prohibits administering incentive training indoors, except for the squad bay quarterdeck.

[19] Record at 772, 1018, 1055.

This was not the only time Recruit RH had been singled out by the appellant. The government presented evidence that the appellant maltreated Recruit RH throughout recruit training. Multiple recruits testified consistently, that the appellant referred to Recruit RH as "ISIS" and routinely called him "terrorist." Gunnery Sergeant EM was the Senior Drill Instructor for Platoon 3052, and the appellant's supervisor. He testified that he witnessed the appellant calling Recruit RH a "terrorist" and counseled the appellant and other drill instructors against calling recruits names based on "where [they were] from" warning the appellant "that it's not going to happen."[20]

### 3. Maltreatment of Recruit AB

On the same night the appellant ordered Recruit RH to get into a dryer, he and Sergeant ME visited the Platoon 3054 squad bay, despite neither being assigned to that Platoon. The appellant singled out Recruit AB. Recruit AB testified that he awoke that night to the appellant yelling, "Where's the terrorist? Where's the terrorist?"[21] Recruit AB explained that when he got to boot camp, he tried to practice his "parents' faith in Islam" and asked his drill instructors for a Quran.[22] While the rest of Platoon 3054 slept, the appellant and Sergeant ME marched Recruit AB into the showers, turned the water on and performed incentive training for ten to fifteen minutes. Once finished with the unauthorized incentive training, the appellant ordered Recruit AB, now soaking wet, into the laundry room. The appellant called him "ISIS," "terrorist," and asked "if he had any bomb making material."[23] Once in the laundry room, the appellant and Sergeant ME told Recruit AB that "the Marine Corps paid them the big bucks . . . to weed out motherf***s like [him]."[24] Just as they did with Recruit RH, the appellant and Sergeant ME ordered Recruit AB to get into one of the industrial clothes dryers. The appellant and Sergeant ME then asked Recruit AB "if [he] was affiliated with 9/11."[25] After he answered, "no," the drill instructors closed the dryer door and turned it on. Recruit AB testified that after about "20 to 30 seconds" the dryer was

---

[20] *Id.* at 1178-79.

[21] *Id.* at 480.

[22] *Id.* at 477-78.

[23] *Id.* at 1140-41.

[24] *Id.* at 483.

[25] Recruit AB testified that he was not sure which drill instructor—the appellant or Sergeant ME—asked him if he was affiliated with 9/11 and which drill instructor subsequently started and stopped the dryer. *See id.* at 485-89.

switched off, and the drill instructors opened the door and asked Recruit AB if he was still Muslim.[26] When Recruit AB replied that he was, the dryer door was closed and the dryer was turned on again. After another 20 to 30 seconds, the dryer was stopped and Recruit AB was again asked if he still believed in Islam. When he answered, "yes," the dryer was turned on a third time. When the dryer stopped and Recruit AB was asked whether he was still a Muslim, he replied, "no" and was allowed out of the dryer.[27]

The government presented additional evidence of the appellant's maltreatment of Recruit AB. Recruit AB testified that on another occasion a few days after the dryer incident, the appellant once again came to the Platoon 3054 squad bay. Recruit AB testified that the appellant ordered him to simulate chopping off another recruit's head while screaming "Allahu Akbar" and told Recruit AB that the appellant had "been fighting motherf***s like [him]" for "13 or 14 years."[28]

## B. Platoon 3042

### 1. RTO violations

As the Senior Drill Instructor for Platoon 3042, the appellant was in charge of the platoon's training and supervised the other assigned drill instructors. During his short time as Senior Drill Instructor for Platoon 3042, the appellant committed numerous violations of the RTO.[29] The appellant directed one of his subordinate drill instructors to "slay" four or five recruits who stayed behind from drilling with the platoon.[30] Prior to departing, the appellant specifically directed the junior drill instructor that the recruits were to receive "no hydration."[31] The recruits then performed various exercises for an extended period of time, in violation of the RTO.

One evening after lights out, the appellant directed Recruit AG to "bear crawl" with his hands on a towel and push the towel up and down the length

---

[26] *Id.* at 487.

[27] *Id.* at 487-89.

[28] *Id.* at 493-94. The members acquitted the appellant of this conduct and language in Charge II, Specification 2.

[29] The appellant was removed from the platoon following Recruit RS's death within the first week of Platoon 3042's training.

[30] Record at 1335.

[31] *Id.*

of the squad bay for approximately an hour.[32] Recruit AG lost all function in his legs and had to be helped to his rack.[33]

In addition, the appellant made physical contact with the recruits of Platoon 3042. He kicked a footlocker held by one recruit so hard that the recruit went flying backwards and hit his head on the deck. He grabbed another recruit around the neck, strangling him, and slammed the recruit's head against the wall. He forced another recruit to strangle a fellow recruit after the latter had committed an infraction.

### 2. Maltreatment of Recruit RS

Several recruits from Platoon 3042 testified that after Recruit RS told the appellant that he was Muslim, the appellant began to single him out, calling him a "terrorist" or "part of ISIS" on multiple occasions.[34] One recruit testified that the appellant asked Recruit RS "where he was from or what religion he was" and RS responded that "he was Islamic or Muslim or something of that nature." [35]

One morning, Recruit RS woke up and could not speak. He told two different drill instructors that his throat was sore, that he had lost his voice, and had coughed up blood. RS asked to go to medical. After morning chow, as the recruits were cleaning the squad bay, RS failed to report properly when the appellant approached him. The appellant tried to get RS to speak and scream out the proper greeting of the day, but RS was unable to say anything. As a consequence for his inability to properly sound off, the appellant ordered RS to run back to the other end of the squad bay and then back to the appellant and sound off properly. Each time RS ran back to the appellant he failed to sound off properly because of his failing voice, and each time the appellant ordered him to "get back" and do it again—meaning run to the end of the squad bay and return. As a result, RS made several rounds trips until he

---

[32] AG had been one of the recruits that the appellant had ordered his junior drill instructor to "slay." *Id. See also* PE 1 at 18-19 (Depot Order, Ch. 3, Figure 3-6) (prohibiting incentive training after evening shower and prior to the next day's reveille; and prescribing appropriate incentive training exercises and time limits).

[33] *See* PE 1 at 18-19 (Depot Order, Ch. 3, Figure 3-6) ("Recruits will not be required to repeat an exercise once they lack the strength to perform it correctly"; incentive training administered indoors may only be "on the squad bay quarterdeck and to no more than 10 recruits at a time").

[34] *Id.* at 1234, 1251, 1253, 1283, 1310-11, 1323, 1336, 1358, 1388, 1404. The members acquitted the appellant of maltreating RS by calling him a terrorist.

[35] *Id.* at 1298.

clasped his hands around his neck and fell to the ground, unresponsive. While RS was laying on the squad bay floor, the appellant struck him in the face with his open hand. RS grabbed his face, started to cry, and ran out of the squad bay.

Additional facts necessary to resolve the appellant's assigned errors are included below.

## II. DISCUSSION

### A. Uncharged Misconduct and Character Evidence

The appellant's first three assignments of error are related. He claims that the military judge erred in "admitting testimony of uncharged conduct and character evidence," specifically evidence that the appellant "targeted and disliked Muslims."[36] The appellant contends that any "subjective motive regarding religion or ethnicity was not relevant to any of [the charges and specifications]."[37] Next, he claims the trial counsel committed prosecutorial misconduct by referencing this uncharged conduct in his direct examination questions, and then arguing facts not in evidence. Finally, the appellant avers that his counsel were ineffective, in part, because they failed to object to the trial counsel's "improper theme and argument" as well as the underlying "inadmissible evidence" relied on by the trial counsel to make his argument.[38]

Thus, to answer each of these claims, we must first decide whether the evidence introduced by the trial counsel was improper character evidence. We conclude that it was not.

### 1. Military Rules of Evidence

MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 404(a)(1), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.), directs that "[e]vidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Likewise, MIL. R. EVID. 404(b)(1) prohibits the government from presenting "[e]vidence of a crime, wrong, or *other act* . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." (emphasis added).

---

[36] Appellant's Brief of 14 Sep 18 at 49.

[37] *Id.* at 27.

[38] *Id.* at 38.

"A threshold question in determining the admissibility of evidence of other crimes and bad acts is whether the evidence, in actuality, relates to acts unconnected with those for which the defendant is charged, or instead is intertwined with the commission of charged crimes." *United States v. McGill*, 815 F.3d 846, 879 (D.C. Cir. 2016) (per curiam). An act that is "intrinsic" to the charged crime is not subject to the limitations of MIL. R. EVID. 404(b). *Id.* (construing FEDERAL RULE OF EVIDENCE 404(b)). "Intrinsic evidence encompasses evidence that is either of an act that is part of the charged offense or is of acts performed contemporaneously with the charged crime . . . if they facilitate the commission of the charged crime." *United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011) (per curiam) (internal citation and quotation marks omitted). Thus, if the uncharged misconduct is relevant to prove the charged offense, "it is not evidence of some other crime." *United States v. Green*, 617 F.3d 233, 249 (3d. Cir. 2010) (internal citation and quotation marks omitted).

### 2. Evidence of recruits' religion

We review a military judge's ruling to admit or exclude evidence for an abuse of discretion. *United States v. Eslinger*, 70 M.J. 193, 197 (C.A.A.F. 2011). But where an appellant fails to object at trial, he forfeits appellate review absent plain error. *Id.* Here, the appellant's trial defense counsel never objected to any questions regarding RH's, AB's, or RS's religion or their ethnic background. Therefore, we review the admission of this evidence for plain error. To demonstrate plain error, an appellant must establish that: "(1) an error was committed; (2) the error was plain, or clear, or obvious; and (3) the error resulted in material prejudice to substantial rights." *United States v. Hardison*, 64 M.J. 279, 281 (C.A.A.F. 2007).

Article 93, UCMJ, proscribes "cruelty toward, or oppression or maltreatment of, any person subject to [the appellant's] orders." 10 U.S.C. § 893 (2012). The elements of this crime are (1) "[t]hat a certain person was subject to the orders of the accused"; and (2) "[t]hat the accused was cruel toward, or oppressed, or maltreated that person."[39] In order to convict the appellant of maltreatment as alleged in the three specifications of Charge II, the government was required to prove, among other things, that appellant "maltreated" each named recruit "by wrongfully" calling that recruit "a terrorist."[40] In addition, for Recruit RH, the government had to prove that the appellant called RH "ISIS."[41] Likewise, for Recruit AB, the government had to prove that the

---

[39] MANUAL FOR COURTS-MARTIAL, UNITED STATES, pt. IV, ¶ 17.b (2012 ed.).

[40] Charge Sheet.

[41] *Id.* at Charge II, Specification 1.A.

appellant told Recruit AB that he had "been fighting mother***s like you"[42] and that he ordered Recruit AB to "simulate chopping off [another recruit's] head with a knife while yelling, 'Allahu Akbar.' "[43]

In explaining that maltreatment, under Article 93, UCMJ, was a general intent crime, our superior court clarified that,

> in order to obtain a conviction under Article 93, UCMJ, the Government must prove that: (a) the accused *knew* that the alleged victim was subject to his or her orders; (b) the accused *knew* that he or she was making statements or engaging in certain conduct in respect to that subordinate; and (c) *when viewed objectively under all the circumstances*, those statements or actions were unwarranted, unjustified, and unnecessary for any lawful purpose and caused, or reasonably could have caused, physical or mental harm or suffering.

*United States v. Caldwell*, 75 M.J. 276, 281 (C.A.A.F. 2016) (emphasis in original); see also *United States v. Harman*, 68 M.J. 325, 328 (C.A.A.F. 2010) (Maltreatment requires an objective review of the appellant's action "in light of the totality of the circumstances."). It is the third prong of *Caldwell's* test that merits discussion here.

The appellant was charged with maltreating recruits by calling them a "terrorist" or "ISIS"; by telling a recruit that he had been fighting people like the recruit; and by ordering a recruit to simulate chopping off someone's head while screaming an Arabic phrase.[44] The government was, therefore, required to prove that these statements and actions by the appellant were "unwarranted, unjustified, and unnecessary for any lawful purpose *and caused, or reasonably could have caused, physical or mental harm or suffering.*" *Id.* (emphasis added). The fact that Recruits RH, AB, and RS were Muslim, or at the very least the appellant thought they were Muslim, was relevant to prove mental harm or suffering—required for a conviction under Article 93, UCMJ.

Indeed, simply calling anyone a "terrorist" or "ISIS," without more, certainly causes no physical harm, and may not reasonably cause mental suffer-

---

[42] *Id.* at Charge II, Specification 2.B.

[43] *Id.* at Charge II, Specification 2.E.

[44] We note that "Allahu Akbar" is a common greeting, culmination of conversation and call to prayer used by those of the Islamic faith to proclaim the greatness of God. As alleged in the charged misconduct, it conjures up a shortsighted and hateful association with terrorist groups or acts associated with religious extremists.

ing. On the other hand, when a Marine drill instructor singles out recruits he believes to be Muslim, and calls those recruits "terrorist" or "ISIS," those words become racial epithets and are far more likely to cause the mental harm or suffering envisioned by *Caldwell.* Context matters. In this context, the appellant was addressing recruits who joined the military while their country was fighting a two-decade War on Terror in which the enemy has largely consisted of extremist Islamic terror organizations like ISIS.

*Caldwell* appropriately requires that we take an objective view, taking into consideration all the circumstances. The government presented evidence that the appellant called these three recruits "terrorist" or "ISIS" and took the other action alleged in the maltreatment specifications *because* he believed the recruits were Muslim or of Middle Eastern descent. This evidence was relevant when considering, "under all the circumstances," whether the appellant's actions "caused, or reasonably could have caused . . . mental harm or suffering." *Caldwell*, 75 M.J. at 281. Thus, evidence tending to establish that Recruits RH, AB, and RS were Muslim or of Middle Eastern ancestry had an "immediate relation to the determination of guilt" and was "part and parcel" of the maltreatment specifications. *United States v. Fowler*, 9 M.J. 149, 150 (C.M.A. 1980) (internal citation and quotation marks omitted). Without some nexus between the words and actions taken by the appellant and the mental harm or suffering caused, the government fails in its proof. Therefore, we find no error—and certainly no plain error—in the military judge's failure to *sua sponte* reject evidence related to the recruits' religion or ethnic background.

### 3. Additional evidence of uncharged misconduct

Besides evidence related to the recruits' religion or ancestry, the appellant also generally alleges that the military judge erred in admitting additional uncharged misconduct—evidence of additional violations of the RTO that were not specifically charged. We thus review the military judge's decision to admit the evidence for an abuse of discretion. *Eslinger*, 70 M.J. at 197. A military judge abuses his discretion when his findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013). The abuse of discretion standard recognizes that a military judge "has a range of choices and will not be reversed so long as the decision remains within that range." *Id.* (citation and internal quotation marks omitted).

Although the appellant recites a lengthy list of uncharged acts that were elicited by the trial counsel, we note only two such instances where the mili-

tary judge actually admitted the evidence over the trial defense counsel's objection.[45] First, the military judge admitted testimony that the appellant "stomped" and "kicked" recruits in the laundry room.[46] Charge 1, Specification 4 alleged that the appellant "walk[ed] and jump[ed] on" recruits in the laundry room, and the trial defense counsel objected that the more severe characterization was uncharged misconduct. The military judge ruled that "walking and jumping" on the recruits fairly "contemplates" the witness's testimony that the appellant "stomped and kicked" recruits, and was "part and parcel" of the offense alleged.[47] We find the military judge's decision was well within his range of choices and did not therefore abuse his discretion in reaching this conclusion.

Second, the military judge permitted a recruit to testify that he witnessed another recruit inadvertently kick a fellow recruit while they were executing the appellant's unauthorized incentive training. The military judge overruled an uncharged misconduct objection after clarifying that it was another recruit—and not the appellant—that had kicked a fellow recruit. The military judge then specifically instructed the members that they were to "disregard . . . any statement that might have suggested that [the appellant] was in any way responsible for a recruit being kicked in the face."[48] We find no abuse of discretion, and conclude that evidence of one recruit inadvertently kicking another recruit during incentive training, was "part and parcel" of the charged misconduct alleging that the appellant administered unauthorized incentive training.

A careful review of the record indicates that the trial defense counsel frequently objected when they believed testimony described inadmissible uncharged misconduct. Likewise, the military judge scrupulously limited the government's witness examinations, strictly limiting testimony to the charged offenses.

### 4. Prosecutorial misconduct

The appellant contends that the trial counsel committed prosecutorial misconduct by improperly relying on inadmissible character evidence

---

[45] *See* Appellant's Brief at 54-55. In each instance, the military judged either sustained an objection from the trial defense counsel or instructed the members *sua sponte* to disregard the testimony.

[46] Record at 953-54.

[47] *Id.* at 954.

[48] *Id.* at 1016.

throughout questioning of witnesses and in argument. In addition, the appellant contends that the trial counsel argued facts not in evidence, because there was no evidence admitted at trial that the three named victims of the maltreatment specifications were Muslim. Finally, the appellant contends the trial counsel inflamed the members' passions by "connecting the dots" between the appellant's charged misconduct and Recruit RS's death.[49]

Because the appellant did not raise a prosecutorial misconduct or improper argument objection at trial, we review for plain error. *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018). As we noted above, plain error occurs when "(1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citations omitted). Because we conclude that evidence of Recruits RH's, AB's and RS's religion and ethnic background were intrinsic to the maltreatment specifications, we find no plain or obvious error with the trial counsel's argument, nor with the questions he asked. Evidence that the appellant was verbally abusive to the named recruits because he believed they were Muslim or of Middle Eastern descent was admissible, under the totality of the circumstances, to substantively prove that he maltreated the recruits.

We also find no merit in the appellant's argument that the trial counsel committed prosecutorial misconduct because he argued facts not in evidence. We conclude, rather, that arguing the appellant targeted Recruits RH, AB, and RS because they were Muslim was a reasonable inference based on the record. First, Recruit AS testified that the drill instructors, including the appellant, called Recruit RH a terrorist *because* he was Muslim and Sergeant ME testified that the appellant was berating Recruit RH, calling him "terrorist" and "ISIS" and "asking questions about the Quran, about how Muslims are here to kill the Christians."[50] Recruit AB testified that he told the drill instructors he wanted to pursue his parents' Muslim faith and asked for a Quran. After placing Recruit AB in a clothes dryer and starting and stopping it with Recruit AB inside, the appellant and Sergeant ME asked Recruit AB three times whether he "was still Muslim" or whether he "still believed in Islam."[51] A recruit from Platoon 3042, Recruit TL, testified that Recruit RS told the appellant he was "Islamic or Muslim or something of that nature" in re-

---

[49] Appellant Brief at 33.

[50] Record at 1131.

[51] *Id.* at 487-88.

sponse to the appellant asking where RS was from or what religion he was.[52] In short, there was ample evidence admitted at trial from which the trial counsel could reasonably infer that the appellant both believed RH, AB, and RS were Muslim, and that he maltreated them because of it. *See United States v. Halpin*, 71 M.J. 477, 479 (C.A.A.F. 2013) ("As a zealous advocate for the government, trial counsel may argue the evidence of record, as well as all reasonable inferences fairly derived from such evidence.") (citation and internal quotation marks omitted).

Finally, we reject the appellant's argument that the trial counsel improperly inflamed the members' passions by hinting at Recruit RS's death and tying it to the appellant's actions. A prosecutor may not "seek unduly to inflame the passions or prejudices of the court members." *United States v. Barrazamartinez*, 58 M.J. 173, 176 (C.A.A.F. 2003) (quoting *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983)). Indeed, there is an "exceedingly fine line which distinguishes permissible advocacy from improper excess." *Fletcher*, 62 M.J. at 183. But here, the military judge took judicial notice of RS's death and, at the request of the appellant, instructed the members concerning RS's death prior to opening statements, using language suggested by the appellant's trial defense counsel. The trial counsel referenced RS's death in his opening statement, but couched it in terms of the obstruction of justice specification related the "death investigation into Recruit [RS]."[53] In addition, the appellant's claim that the trial counsel inflamed the members' passions is largely based on his other assertions that the trial counsel relied on inadmissible evidence, facts not in evidence, and uncharged misconduct—assertions we have rejected. Therefore, we do not find that referring to RS's death, and arguing that the appellant targeted the recruits because they were Muslim amounted to plain error.

### 5. Ineffective assistance of counsel

The appellant next contends that his trial defense counsel were ineffective for not challenging the government's "overarching narrative" that the appellant was targeting Muslim recruits, and as a result failed to object to the trial counsel's improper argument and introduction of inadmissible evidence.[54]

We review claims of ineffective assistance *de novo*. *United States v. Captain*, 75 M.J. 99, 102 (C.A.A.F. 2016). The appellant bears the burden of

---

[52] *Id.* at 1298.

[53] *Id.* at 469.

[54] Appellant's Brief at 40.

showing that his trial defense counsel's performance was deficient and that there is a reasonable probability that the deficient performance prejudiced the appellant at trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). When evaluating the performance of counsel, we employ a "strong presumption that counsel's conduct falls within the wide range of reasonable assistance." *Id.* at 689. Since counsel are presumed competent, the appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987). In effect, this requires a "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *United States v. Dewrell*, 55 M.J. 131, 133 (C.A.A.F. 2001).

Failure to pursue a particular legal claim, however, is not necessarily deficient conduct by counsel. "If that claim is not shown to have a reasonable probability of being found meritorious as a matter of law and fact, the failure to pursue it is not error and certainly not ineffective assistance of counsel." *United States v. Terlep*, 57 M.J. 344, 349 (C.A.A.F. 2002). Here, we have already determined that evidence suggesting that the appellant targeted RH, AB, and RS because he believed they were Muslim was intrinsic to the maltreatment specifications and, therefore, not inadmissible propensity evidence. Likewise, the trial counsel committed no prosecutorial misconduct when he argued those facts and their reasonable inferences to the members. As a result, we conclude the appellant's trial defense counsel were not ineffective for failing to object to the government narrative—evidence or argument—because there is no reasonable probability any such objections would have been meritorious.

### B. Voir Dire

In addition to claiming his counsel were ineffective for failing to challenge the government's narrative that the appellant targeted three Muslim recruits, the appellant also alleges his counsel were ineffective because they failed to properly *voir dire* and challenge the members based on their pre-existing knowledge of the alleged crimes and, particularly, RS's death.

In analyzing this claim of ineffectiveness, we apply the two-pronged *Strickland* standard articulated above. We "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

The appellant is "entitled to have his case heard by members who are not predisposed or committed to a particular punishment, or who do not possess an inelastic attitude toward the punitive outcome." *United States v. Martinez*, 67 M.J. 59, 61 (C.A.A.F. 2008). But "panel members are not automatically

disqualified simply because they have learned facts about an accused from outside sources." *United States v. Akbar*, 74 M.J. 364, 397 (C.A.A.F. 2015).

Five of the eight members had prior knowledge of cursory facts and rumors surrounding the allegations against the appellant. The panel President had seen prior news articles about "drill instructor hazing."[55] The senior enlisted panel member had read prior reports that included RS's name. He explained what he read:

> [RS], Muslim origin, put in the dryer, and then hazing allegations. Or it could have been jumping out of the window. So I do know of the dryer incident and the jumping out of [the] window . . . . I know this is a big thing for America, a big thing for the Marine Corps. And that's all I know: with the dryer, the suicide that took place, and the name [RS]. And I knew it took place down at Parris Island.[56]

Another enlisted member knew about the allegations and that a "recruit threw himself off the balcony and died. And someone was in—trying to get investigated for it . . . ."[57] Another remembered reading about "the recruit and the dryer and, obviously, the recruit's death."[58] Finally, another member knew about the "dryer allegation."[59] The trial defense counsel did not challenge any of the five members who had prior knowledge of the allegations, and according to the appellant "offered only superficial *voir dire* on these [m]embers' prior knowledge of allegations and rumors, even during individual *voir dire*."[60] The appellant argues that his trial defense counsel's failure to conduct "meaningful *voir dire"* and "failure to challenge [m]embers for actual or implied bias" cast "substantial doubt as [to] the legality, fairness, and impartiality" of the court-martial.[61] We disagree.

Besides the trial defense counsel, both the military judge and the trial counsel examined each of these members extensively and explored whether the members' exposure to pretrial information had an impact on their ability

---

[55] Record at 322.

[56] *Id.* at 380.

[57] *Id.* at 391.

[58] *Id.* at 396.

[59] *Id.* at 416.

[60] Appellant's Brief at 43.

[61] *Id.* at 43-44.

to be impartial. The record indicates that the *voir dire* reached the limit of those five members' limited memories of the news reports they had read. No further questioning would have provided useful information, nor would additional questioning provide a basis for a successful challenge for cause. Each of the five members affirmed—without hesitation—that they could put aside any information they learned pretrial and decide the case based on the evidence presented at the court-martial and in accordance with the military judge's instructions. The appellant does not explain what additional information he would have elicited during a more extensive *voir dire*. Consequently, we find that the trial defense counsel did not fall below an objective standard of reasonableness in declining to inquire further regarding the members' pretrial knowledge of the allegations or to challenge any of the five members.

Regardless, even were we to find the trial defense counsel's performance deficient, we would find no prejudice. That is, the appellant has failed to demonstrate a "reasonable probability that, but for" his trial defense counsel's failure to conduct additional *voir dire*, the results of court-martial "would have been different." *Strickland*, 466 U.S. at 694. First, the evidence against the appellant was overwhelming. Over 60 witnesses testified about a litany of RTO violations and physical and verbal abuse of recruits at the hands of the appellant. The members deliberated for approximately 12 hours, requested to review testimony, and returned mixed findings that picked through each specific charged act. They were engaged throughout the trial and asked or attempted to ask questions of most witnesses. Second, the trial defense counsel, trial counsel, and military judge all asked the members about their prior exposure to the allegations. The appellant fails to explain what additional information may have been gleaned from additional *voir dire* that might have led to a challenge for cause sufficient to change the result of his court-martial. Finally, each of the five members affirmed they would base their decision solely on the evidence presented at the court-martial.

Therefore, we find neither deficient performance nor prejudice to the appellant from either his counsel's failure to conduct additional *voir dire* or to challenge any of the five members who had previous knowledge of the allegations.

## C. Unsworn Statement of Victim Designee

Following the government's case in aggravation, the military judged permitted trial counsel to read the unsworn statement of Ms. GS, Recruit RS's mother, pursuant to RULE FOR COURTS-MARTIAL (R.C.M.) 1001A, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.). Since Recruit RS was deceased, the military judge appointed Ms. GS as Recruit RS's designee pursu-

ant to R.C.M. 801(a)(6). The trial counsel read the admitted portions of Ms. GS's statement to the members:

> The truth is that the Marines lied to me and my family and my son. The Marines made promises they never intended to keep. My son and I were never told by the Marines' recruiter that Muslims got beaten and abused in Parris Island so badly by their Marines because of their religion. We never knew other Muslims were abused too. They purposely targeted him and put him in a situation and under the control of Marines who hated Muslims.

> The Marines were the ones who came to my son's college to recruit people. They were the ones who persuaded him to go and told him about all these benefits and opportunities. That's when my son was persuaded to go for the Marines.

> Not only that, [RS] was intentionally slapped and abused so much. Why? Why did they treat him like a terrorist? He was born in America and raised here. He was an American citizen. What did he do to deserve that? He had trusted the Marines. I need justice for my son.[62]

Article 6b, UCMJ, 10 U.S.C. § 806b, "provides victims of UCMJ offenses the 'right to be reasonably heard' at a sentencing hearing related to the crime in which they were the victim." *United States v. Hamilton*, 78 M.J. 335, 339 (C.A.A.F. 2019). The President promulgated R.C.M. 1001A to "facilitate[ ] the statutory right to be reasonably heard." *United States v. Barker*, 77 M.J. 377, 378 (C.A.A.F. 2018) (internal citation and quotation marks omitted). A victim may make a sworn or unsworn statement during sentencing in a non-capital case. R.C.M. 1001A(b)(4)(B). The contents of the statements may include "victim impact or matters in mitigation." R.C.M. 1001A(c). Victim impact includes "any financial, social, psychological, or medical *impact on the victim* directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2) (emphasis added). While this language makes victim impact evidence broader and more encompassing than government aggravation evidence, defined as "directly related to or *resulting* from"

---

[62] Record at 1775. Ms. GS's original statement was "two pages" long, however the trial counsel conceded that several paragraphs were inadmissible given the military judge's ruling that prohibited any "causal link" between the appellant's crimes and Recruit RS's death. *Id.* at 1759. As a result, only three paragraphs from Ms. GS's statement were read to the members.

the offense, under R.C.M. 1001(b)(4) (emphasis added), the financial, social, psychological, or medical impact must still be on *the victim*. When the victim is deceased, the military judge "shall" designate a representative "to assume the victim's rights." 10 U.S.C. § 806b(c)(4). The victim's designee "assum[es] the legal rights of the victim as they pertain to the victim's status as a victim of any offense(s) properly before the court." R.C.M. 801(a)(6).

"Interpreting R.C.M. 1001A is a question of law, which we review de novo." *Barker*, 77 M.J. at 382. We review a military judge's decision to admit an unsworn victim impact statement pursuant to R.C.M. 1001A for abuse of discretion. *Hamilton*, 78 M.J. at 340. A military judge abuses his discretion when he "permit[s] the introduction of victim impact statements that [do] not comply with . . . R.C.M. 1001A." *Id.*

The appellant claims admission of GS's unsworn statement was prejudicial error because Ms. GS was "not in contact with [RS] at any relevant time during boot camp" and the statement, therefore, "was entirely speculative and lacked sufficient foundation to represent a victim impact statement."[63] In addition, he contends that the statement contains irrelevant and prejudicial comments relayed from Ms. GS's perspective rather than the victim's perspective. The government counters, citing *Barker*, that victim statements presented under R.C.M. 1001A do "not constitute witness testimony" and that, therefore, the military rules of evidence, specifically MIL. R. EVID. 602,[64] do not apply. *Barker*, 77 M.J. at 382.

In *Hamilton,* the CAAF explained:

> [T]he Military Rules of Evidence are applicable to sentencing [and] thus provid[e] procedural safeguards to ensure the reliability of evidence admitted during sentencing . . . unsworn victim impact statements are uniquely situated in the substrate of the sentencing process. The plain language of R.C.M. 1001A (2016) clearly contemplates *that at least some of the Military Rules of Evidence are inapplicable to victim impact statements.*

---

[63] Appellant's Brief at 60.

[64] MIL. R. EVID. 602 provides:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony. This rule does not apply to a witness's expert testimony under MIL. R. EVID. 703.

*Hamilton*, 78 M.J. at 342 (emphasis added). However, in *Hamilton*, the CAAF never decided the extent to which the Military Rules of Evidence apply to victim impact statements presented pursuant to R.C.M. 1001A. Instead, the court held that the military judge erred in admitting victim impact statements from child pornography victims because there was no evidence the victims requested their statements be admitted at Hamilton's court-martial.

In reaching this conclusion, the CAAF clarified that "the rights vindicated by R.C.M. 1001A (2016) are personal to the victim in each individual case [and] the introduction of statements under this rule is prohibited, without, at a minimum, either the presence or request of the victim, . . . the special victim's counsel, or the victim's representative." *Id.* at 341 (citing *Barker*, 77 M.J. at 382). The CAAF further explained that while R.C.M. 1001A provides victims the right to make an unsworn statement, it "does not encompass an unsworn statement from an unidentified victim who is unaware of the case at hand. Such statements are virtually irrebuttable and inconsistent with R.C.M. 1001A(e)'s mandate that the defense may 'rebut any statements of fact' contained in unsworn statements." *Id.* at 342.

Here, there is no doubt that Recruit RS was a victim of the appellant's crime of maltreatment. There is also no doubt that Ms. GS was properly designated by the military judge as RS's designee to exercise his rights as a victim under Article 6b, UCMJ. Therefore, there is also no doubt that Ms. GS had the statutory and regulatory right to submit an unsworn victim impact statement. However, when Ms. GS was appointed as the designee for her son, she assumed "the victim's rights" as well as the corresponding limitations. 10 U.S.C. § 806b(c)(4); *see also* R.C.M. 801(a)(6) (Victim's designee "assum[es] the legal rights of the victim as they pertain to the victim's status as a victim of any offense(s) properly before the court"). She did not become a victim for purposes of R.C.M. 1001A, in her own right.[65] Therefore, any statement she could properly present must have described the "financial, social, psychological, or medical impact *on the victim* directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2). That is, to be in compliance with R.C.M. 1001A, Ms. GS's unsworn victim impact statement had to describe the impact of the appellant's crimes *on RS*.[66] We

---

[65] *See* R.C.M. 1001A(b)(1) ("a 'crime victim' is an individual who has suffered *direct* physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty") (emphasis added).

[66] *See also* R.C.M. 1001A, Discussion ("A victim's unsworn statement should not exceed what is permitted under R.C.M. 1001A(c) . . . . Upon objection or *sua sponte*, a

conclude that her statement fails to comply with this requirement and that the military judge, therefore, abused his discretion in admitting such a broad statement. As a result, we need not determine to what extent the Military Rules of Evidence apply to victim impact statements admitted pursuant to R.C.M. 1001A.

Ms. GS's statement reiterated facts and themes brought up throughout the trial and reflected her belief that the Marines lied to her son when he was recruited; that recruiters did not tell him he would be targeted because he was Muslim; or that other Muslims had been abused. The trial counsel argued, and the military judge agreed, that Ms. GS's statement portrayed the betrayal RS felt after having been recruited into the Marine Corps and then abused during boot camp. However, we disagree. At best, the statement reflects Ms. GS's sense of betrayal for what the Marine Corps, and to a lesser extent the appellant, did to her son. More overtly, it merely rehashes the government's theme and theory that the appellant maltreated RS because he was Muslim. What her statement does not do, however, is describe the impact that the appellant's maltreatment had *on her son*—which she did not know, having had no contact with him during his time in boot camp. We recognize that Article 6b, UCMJ, grants victims or their designees the right to be reasonably heard. But the President has bound the content that may be presented pursuant to that right to mitigation evidence or "any financial, social, psychological, or medical impact *on the victim* directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

Although we conclude the military judge abused his discretion, we find no prejudice to the substantial rights of the appellant. Article 59(a), UCMJ. "If an error occurs in the admission of evidence at sentencing, the test for prejudice is whether the error substantially influenced the adjudged sentence." *Hamilton*, 78 M.J. at 343 (citation and internal quotation marks omitted). When determining whether an error substantially influenced a sentence, we consider the following four factors: "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *United States v. Bowen*, 76 M.J. 83, 89 (C.A.A.F. 2017) (citation omitted).

Here, the case presented by the Government at sentencing was strong. In addition to the numerous witnesses that testified regarding the appellant's

---

military judge may stop or interrupt a victim's unsworn statement that includes matters outside the scope of R.C.M. 1001A").

misconduct during the government's case-in-chief, the government called two additional witnesses in sentencing. A fellow drill instructor testified about how upset and angry he was; how he has to live with the knowledge that the appellant abused their recruits. Recruit AS testified about the day the appellant pulled him out of his rack and knocked him unconscious and how he tried to "stay in the shadows" after that and just get through boot camp.[67] In addition to the government's case in aggravation, three of the appellant's victims, besides Ms. GS, submitted unsworn statements pursuant to R.C.M. 1001A. Recruit AB read his unsworn statement before the members and RH and Recruit AG submitted written unsworn victim impact statements.[68]

Recruit AB stated that since recruit training, he has suffered from anxiety and depression, a lack of motivation, and problems sleeping. He told the members that he often has nightmares and in his dreams he is "powerless and full of fear."[69] In some dreams, Recruit AB explained, he sees the appellant "killing [his] family" and would awaken in the middle of the night, "hyperventilating and in panic, crying about what happened."[70]

Recruit RH explained that the appellant's maltreatment made him think he made a mistake joining the Marine Corps. He was worried about joining the Fleet because he thought others would treat him the same, simply based on the color of his skin. The appellant made him "lose all trust in [his] senior leaders."[71] Finally, Recruit AG explained how he trained for nearly a year to get in shape for the Marine Corps and the excessive incentive training ordered by the appellant caused him to develop Rhabdomyolysis, "a complete breakdown of muscle tissue," and ultimately resulted in his discharge from the Marine Corps. As a result, he "lost his opportunity to become a United States Marine."[72]

In contrast, the appellant's sentencing case was weak by comparison. It consisted of testimony from the appellant's mother-in-law and wife, his own unsworn statement, his service record, and pictures of his family. The appel-

---

[67] Record at 1773.

[68] *See* Court Exhibits (CE) I and II, respectively.

[69] Appellate Exhibit (AE) CCIII at 1. Recruit AB read his statement from AE CCIII in open court.

[70] *Id.*

[71] CE I.

[72] CE II.

lant's sentencing case focused on his career and his dedication as a husband and father. The appellant never expressed remorse for any of the offenses.

Additionally, while the content of Ms. GS's statement was material for sentencing purposes, it was cumulative and therefore of limited use. As we noted previously, much of the statement simply restated facts elicited at trial and themes argued by the trial counsel. Although the trial counsel did reference Ms. GS's statement in his argument on sentencing, it was a relatively minor part of his argument. In addition, the military judge instructed the members that when considering the victim impact statements, they should consider that they "[we]re not under oath, their inherent probability or improbability, [and] whether they [we]re supported or contradicted by evidence."[73] Finally, the statement was not presented personally by Ms. GS. Thus, any emotional impact the statement might have had on the members was lessened by its presentation from the trial counsel.

In summary, the three short paragraphs from Ms. GS's statement were a very small portion of a trial that spanned over two weeks and encompassed over 1800 transcribed pages. Ms. GS's statement reveals her altogether unsurprising anger at the appellant for maltreating her son, and restates facts already before the members. The government called over 60 witnesses that described the appellant's maltreatment and orders violations in much greater detail, and the government's case in aggravation, along with the victim impact statements from the appellant's other victims, was compelling. Therefore, we conclude that the appellant was not prejudiced by the erroneous admission of Ms. GS's unsworn statement.

**D. Inappropriately Severe or Disparate Sentence**

Finally, the appellant avers that his sentence to 10 years' confinement and a dishonorable discharge is inappropriately severe and disproportionally severe given the punishments of other drill instructors accused of RTO violations and maltreatment. We disagree.

An appellant seeking relief for a disparately severe sentence "bears the burden of demonstrating that any cited cases are closely-related to his or her case and that the sentences are highly disparate." *United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999) (internal quotation marks omitted). If the appellant shows both that his case is "closely related" and his sentence is "highly disparate," then the burden shifts to the government to show there is "a rational basis for the difference." *Id.; see also United States v. Durant*, 55

---

[73] Record at 1821.

M.J. 258, 262-63 (C.A.A.F. 2001). Cases are "closely related" when they "involve offenses that are similar in both nature and seriousness or which arise from a common scheme or design." *United States v. Kelly*, 40 M.J. 558, 570 (N.M.C.M.R. 1994).

The appellant argues that he committed very few of his crimes alone, and that in most instances, Sergeant ME accompanied him and actively participated in the RTO violations and maltreatment. Sergeant ME was facing general court-martial and entered into a pretrial agreement, wherein he agreed to testify against the appellant in exchange for his guilty pleas at a summary court-martial.[74] Sergeant ME was convicted, pursuant to those pleas, of three specifications of RTO violations, two specifications of maltreatment, and a specification of disorderly conduct.[75] He was sentenced to 45 days' restriction and reduction to paygrade E-4.[76] Two other drill instructors testified against the appellant. One was granted immunity in exchange for his testimony and the other entered a pretrial agreement and avoided court-martial charges. Both received administrative counseling. The appellant contends these fellow drill instructors represent "closely related cases." We disagree.

The appellant was convicted of 4 charges and 13 specifications of misconduct, including maltreating 3 Muslim recruits from 3 different platoons, strangling, punching, or slapping 11 different recruits, conducting unauthorized incentive training, being drunk and disorderly, and repeatedly lying to an investigator. Although the appellant points out that other drill instructors participated in some of his misconduct, those fellow drill instructors shared only a portion of the abuse he leveled on recruits, and he was always the most senior Marine present. *See United States v. Wacha*, 55 M.J. 266 (C.A.A.F. 2001) (affirming that cases were not closely related when only 4 of 16 drug offenses involved co-actor). In short, neither Sergeant ME's nor the other two drill instructors' misconduct spanned the scope or duration of the appellant's.

Even assuming, however, that the other drill instructors' cases were closely related, and assuming *arguendo*, that the appellant was able to meet his burden to demonstrate that the sentences are "highly disparate," we nevertheless conclude there was a rational basis for the disparity. When cases are "closely related and yet result in widely disparate dispositions" such sentencing dispositions must be supported "by good and cogent reasons." *Kelly*, 40 M.J. at 570. Moreover, we recognize that a convening authority's discretion

---

[74] *See* AE CLXI.

[75] *Id.* at 4.

[76] Staff Judge Advocate's Recommendation of 30 Jan 18 at 3.

on "the selection of the appropriate forum for disposition is part of prosecutorial discretion," and "[d]ecisions on how to process a case are not considered *de novo* at the reviewing court level." *Id.* As we noted earlier, the appellant's misconduct was more severe and pervasive than that of his fellow drill instructors. While each drill instructor admitted to some misconduct with the appellant, none participated in all of the misconduct for which the members found the appellant guilty. Here, the other drill instructors were all junior to the appellant, all agreed to plead guilty, accept some responsibility for their actions, and testify against the appellant. Therefore, we conclude that there was a rational basis for any disparity in the appellant's sentence.

We next consider whether the appellant's sentence to 10 years' confinement and a dishonorable discharge is inappropriately severe. We review sentence appropriateness *de novo*. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). This court "may affirm only . . . the sentence or such part or amount of the sentence, as it . . . determines, on the basis of the entire record, should be approved." Art. 66(c), UCMJ. "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves." *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988). This requires our "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender." *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (citation and internal quotations marks omitted). While we have significant discretion in determining sentence appropriateness, we may not engage in acts of clemency. *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010).

The appellant maltreated three Muslim recruits, putting two inside an industrial-strength clothes dryer, and turning it on and tumbling one recruit inside the dryer until he renounced his faith is Islam. He routinely called two of the recruits "terrorist." He punched recruits in the face, causing one to bleed from the mouth and nose and another to fall unconscious. He routinely slapped recruits—hard. He strangled recruits with his hands. He ordered recruits to hit and strangle their fellow recruits for various infractions, stepping in to take over when the recruits were not sufficiently brutal for his liking. He conducted unauthorized incentive training so often it became commonplace. Recruits testified that the appellant forced them to drink excessive quantities of chocolate milk and then put them through intense physical training in order to make them vomit—an act that had no training purpose and served only to apparently amuse the appellant at the recruits' expense. The appellant often awoke recruits after lights out to conduct physical training, sometimes in the shower room; sometimes in the laundry room. Recruits testified that the appellant poured laundry detergent onto the deck and forced them to use each other as human mops to clean the deck. He frequently drank alcohol before tormenting the recruits. He singled out weaker re-

cruits for excess physical training. Recruit AG was forced to bear crawl across the deck for so long that he developed a medical condition that required his separation from the Marine Corps. He detailed the emotional toll that his medical discharge took on him in his unsworn statement. Recruit AB described the nightmares he has about the appellant.

The appellant was placed in a position of trust, charged with turning young men into Marines. He was one of their first authority figures—their first example of what a Marine was supposed to be. He had nearly unchecked power over every aspect of their lives. He, and his subordinates, stood between the recruits and their goal of becoming Marines. Instead of providing a positive example and conducting meaningful training, he taught his recruits, by his example, that rule-breaking was commonplace and that violence against fellow Marines was not only acceptable, but required to instill discipline. Not only did he fail to correct or report his subordinates' bad behavior, he encouraged it and participated in worse and more pervasive behavior.

While we recognize the mitigation evidence presented by the appellant, including his many military accomplishments and the tragic consequences his conviction has on his family, we are convinced the appellant received the punishment he deserved. The appellant was a bully; his misconduct impacted an entire generation of Marines. We therefore conclude that the sentence is appropriate for the appellant and his offenses. *Snelling*, 14 M.J. at 268. Granting sentence relief at this point would be to engage in clemency, which is beyond our power to grant. *Nerad*, 69 M.J. at 146.

### III. CONCLUSION

After careful consideration of the record of proceedings and the briefs of appellate counsel, we have determined that the approved findings and sentence are correct in law and fact and that no error materially prejudicial to the appellant's substantial rights occurred. Arts. 59(a) and 66(c), UCMJ. Accordingly, the findings and the sentence are **AFFIRMED**.

Senior Judge TANG and Judge LAWRENCE concur.

FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court